## Commonwealth *vs.* Pablo Soto Ortiz.

Suffolk. November 9, 2001. - January 8, 2002.

Present: Marshall, C.J., Greaney, Ireland, Spina, & Cowin, JJ.

*Search and Seizure,* Exigent circumstances. *Constitutional Law,* Search and seizure, Admissions and confessions, Waiver of constitutional rights. *Practice, Criminal,* Voluntariness of statement, Argument by prosecutor, Reasonable doubt, Instructions to jury, Capital case. *Waiver. Evidence,* Admissions and confessions.

Circumstances attending conduct of police at a murder scene in which they concluded that obtaining a warrant was impracticable, that the victim was likely inside a building in need of assistance, and that there was a likelihood that a crowd was about to destroy a likely crime scene justified a warrantless entry by the police into the building and a subsequent search of the premises under both the emergency and the destruction of evidence exceptions to the warrant requirements. [570-574]

At a hearing on a motion to suppress incriminating statements made to police officers, the judge correctly concluded that the Commonwealth satisfied its burden of proving beyond a reasonable doubt both the knowing, willing, and intelligent waiver of Miranda rights by the defendant, and the voluntariness of his statements; further, there was no merit to the defendant's claims that the defendant had been coerced by the police to talk to them and that the judge erred in concluding that the Commonwealth had proved that the defendant had waived his Miranda rights. [574-578]

At a murder trial, certain remarks by the prosecutor in closing argument, viewed in the context of his entire argument, the judge's instructions to the jury, and the evidence at trial, neither impermissibly appealed to the jury's sympathy for the victim [578], influenced the jury's verdict [578], improperly recreated for the jury how the victim's death occurred [579], nor amounted to prejudicial error [579].

This court declined an invitation to overturn the so-called *Webster* reasonable doubt standard set forth in *Commonwealth* v. *Webster,* 5 Cush. 295, 320 (1850). [579-580]

Indictments found and returned in the Superior Court Department on May 30, 1984.

Pretrial motions to suppress evidence were heard by *Vieri Volterra,* J., and *Daniel A. Ford,* J., and the cases were tried before *Ford,* J.

*Stephen Hrones* for the defendant.

*Rosemary Daly*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. On September 18, 1998, a jury in the Superior Court convicted the defendant of the 1984 murder in the first degree (on theories of deliberate premeditation and extreme atrocity or cruelty) of Bernette McLaurin and assault with intent to rape Zindy Gomez. McLaurin and Gomez resided in an apartment building located next to a fruit store operated by the defendant. The defendant fled after the murder and was apprehended and arrested in July, 1995, in Puerto Rico.

The defendant argues error in (1) the denial of his motions to suppress physical evidence seized at the murder scene and his incriminating statements to the police; (2) certain remarks made by the prosecutor in his closing argument; and (3) the judge's use of the *Webster* charge (*Commonwealth* v. *Webster*, 5 Cush. 295 [1850]) to explain reasonable doubt. We conclude that there is no basis to order a new trial and, as to the murder conviction, no reason to exercise our authority under G. L. c. 278, § 33E. Accordingly, we affirm the convictions.

There is no need to summarize the evidence. The Commonwealth's case against the defendant was substantial and the force of the case will unfold as we set forth the findings of fact made by the two judges who heard and denied the defendant's motions to suppress.

1. The judge's findings of fact (which are fully supported by the evidence presented at the suppression hearing) on the defendant's motion to suppress physical evidence are as follows. McLaurin, a twenty-one year old woman, lived with her fiancé, Dean Jeffries, in an apartment building next to the defendant's fruit store in the Jamaica Plain section of Boston. On Saturday, April 28, 1984, Jeffries left the apartment at 7 A.M. to go to work. McLaurin remained alone. When Jeffries returned at about 3:30 P.M., McLaurin was not there. Her pocketbook and keys were on the bed, and the television had been left on. Thinking that McLaurin had stepped out for only a few minutes, Jeffries stayed in the apartment, but McLaurin never returned. He became concerned when he learned that McLaurin failed to

keep an appointment with his mother scheduled for that afternoon. Because McLaurin's mother and stepfather were out of State attending a funeral, Jeffries contacted McLaurin's aunts. After an unsuccessful search for McLaurin, a missing person report was filed, on April 29, at the police station. McLaurin's aunts continued, unsuccessfully, to search for McLaurin. McLaurin's mother and stepfather returned on May 1, learned of McLaurin's disappearance, and contacted the police.

On that same day, McLaurin's relatives questioned residents of her apartment building. Zindy Gomez told them that she had some information, but would only speak to the police. McLaurin's relatives took Gomez to the police station. Gomez told the police that she had been sexually assaulted on Saturday, April 28, at about 9 A.M. by the defendant. Gomez had first met the defendant at a night club. There, she danced with the defendant until he became too aggressive, preventing her from dancing with another man and pushing her down into a chair. Gomez told police that the defendant owned a fruit store, and that she saw him take McLaurin by the arm into the store on Saturday morning.

When McLaurin's relatives returned to the area of her apartment, they concluded that there was a high probability that McLaurin was still in the fruit store. The store was locked, its shades were drawn, but the store displayed a sign in its window reading, "Come in, We're open." A crowd of about twenty-five people, mainly family and friends of McLaurin, had gathered outside the store. From the crowd, police officers learned that the store was open every day, that the defendant worked long hours, and that the defendant often played his trumpet on the sidewalk in front of the store.[1] No one in the crowd had seen McLaurin or the defendant since Saturday morning.

Some people in the crowd obtained a crowbar with the intent to pry open the store door and enter. The police asked them to be patient and advised that it would be better to obtain a warrant. McLaurin's stepfather and other men shouted that they would not wait. One of the officers, noting that it was after 4 P.M.,

---

[1]Although not contained in the judge's findings, the record indicates that the police knocked on the door to the defendant's fruit store, but no one answered.

believed that obtaining a search warrant promptly was unlikely because the court was closed. He determined that McLaurin was likely inside the store and in need of assistance, having been severely injured, kidnapped, raped, or murdered. Mc-Laurin's stepfather, a cousin of Jeffries, and a friend of Jeffries approached the door, and McLaurin's stepfather started to force the door open with the crowbar. Concluding that obtaining a warrant was impracticable, that McLaurin was likely inside the store in need of assistance, and fearing the destruction of a likely crime scene, the police forced entry into the store. Once inside, they detected the odor of putrefaction and followed the odor to a mattress on the floor. Under the mattress they found McLaurin's body, which had been wrapped in a rug and tied with a cord. McLaurin had been strangled with an electrical cord.

The judge correctly applied relevant principles of law to deny the motion. He concluded that the warrantless search of the defendant's store was not unlawful under either the State or Federal Constitution because the Commonwealth satisfied its burden of clearly demonstrating that the search was justified by exigent circumstances. See *Commonwealth* v. *Marchione*, 384 Mass. 8, 10 (1981), and cases cited; *Commonwealth* v. *Di-Geronimo*, 38 Mass. App. Ct. 714, 720-722 (1995). The judge concluded that the search was lawful under both the emergency and destruction of evidence exceptions to the warrant requirement. See *Commonwealth* v. *Marchione*, *supra* at 11-12. See also *Commonwealth* v. *Huffman*, 385 Mass. 122, 125 (1982). As to the emergency exception, the judge explained that the facts warranted the police in having a reasonable belief that McLaurin was in the fruit store in need of immediate assistance, and that they had acted reasonably by trying, unsuccessfully, to quiet and control the crowd before entering the store. As to the destruction of evidence exception, the judge found that the officers, faced with an unruly crowd of which some persons were preparing to storm the store themselves, did not have time to obtain a warrant, and that there was an immediate threat posed by the crowd to the integrity of a possible murder scene.

The defendant argues that, as to the emergency exception, the police lacked compelling reasons, supported by specific and ar-

ticulable facts, that would have led them to believe that Mc-Laurin was either alive and "in life-threatening distress," or "in dire need of immediate assistance" inside the defendant's fruit store. We disagree. There existed objectively reasonable grounds to believe that McLaurin was inside the defendant's fruit store. McLaurin was last seen going into the store with the defendant. No one had heard from or seen either McLaurin or the defendant thereafter. After being seen with McLaurin, the defendant had not conducted business as usual. A sign indicated that his store was open, but it was locked. All of the store's shades were drawn. Further, McLaurin was seen going into the fruit store with the defendant on the same morning that the defendant had sexually assaulted Gomez, and the police had information that the defendant could be aggressive and violent. It appeared from the condition of McLaurin's apartment that she had not intended on an extended absence. Thus, there also existed objectively reasonable grounds to believe that McLaurin was in trouble, whether injured or dead. See *Commonwealth* v. *Snell*, 428 Mass. 766, 775, cert. denied, 527 U.S. 1010 (1999).

We reject the defendant's contention that "[t]he time that passed while the officers were on the scene demonstrated that no exigency existed and that they did not believe that [Mc-Laurin] was inside in need of immediate assistance." As explained by the judge, and supported by the record, during the time that passed, the police were gathering and verifying information, such as the fact that no one (apart from Gomez) had seen the defendant in the last three days; they were also trying to calm and control the crowd outside the store.

There is also no merit to the defendant's argument that the police entered the defendant's store "without having reason to believe that there was any likelihood that someone would imminently destroy evidence inside." The crowd outside the defendant's store was unruly and certain persons expressly stated their desire to enter the store. They were asked by police to wait and refused. McLaurin's stepfather started to gain entry to the store with a crowbar. Had he accomplished his mission and the crowd rushed in, the integrity of any crime scene would have, at the least, been threatened. With McLaurin's stepfather actually attempting to enter the store with the crowbar, the

police were left with no cushion of time to obtain a warrant. That four officers possibly could have secured the area and prevented a crowd of about twenty people from storming the defendant's store behind McLaurin's stepfather is sheer speculation. The officers were in the midst of a very hectic scene, and their response is "to be evaluated in relation to the scene as it could appear to the officers at the time, not as it may seem to a scholar after the event with the benefit of leisured retrospective analysis." *Commonwealth* v. *Young*, 382 Mass. 448, 456 (1981). We conclude that the circumstances justified the warrantless entry and search under the destruction of evidence exigency. See *Commonwealth* v. *Huffman, supra* at 126. Both of the grounds primarily relied on by the judge were, therefore, adequate in fact and law to support his order denying the motion.[2]

2. The trial judge decided the defendant's motion to suppress his incriminatory statements made to Lieutenant Irving Lugo and Officer Luis Morales of the Puerto Rico State police shortly after his arrest on July 20, 1995, in San Juan. After an evidentiary hearing at which both officers testified, the judge issued a memorandum containing his findings of fact (which are fully supported by the evidence) and rulings of law. He found the following facts.

Shortly after police found McLaurin's body, the defendant absconded from Massachusetts, and a warrant for his arrest issued. Based on information from an informant, Lugo and Morales located and arrested the defendant. The officers at all times addressed the defendant in Spanish, as the defendant does not speak or understand English. Once the defendant was placed in a cruiser, Lugo advised the defendant of his Miranda rights using a preprinted form. The defendant then answered two questions indicating that he understood his rights and that he was willing to talk to the police.

On the way to the police station, the defendant was not interrogated, though he engaged in small talk with Morales. Once there, the defendant was transported to Lugo's office where he

[2]Because we conclude that exigent circumstances justified the warrantless entry and search, we need not address the Commonwealth's argument that the search was justified under the doctrine of inevitable discovery.

was again advised of his Miranda rights by Morales who used a preprinted form. The defendant stated that he understood his rights. When asked whether he was willing to speak with the police, the defendant denied being involved in any homicide in Boston. Because the defendant had stated that he understood his rights, Morales asked him to sign a form so indicating, but the defendant refused and stated that he would not sign anything.

After the defendant used the bathroom and made a telephone call, the police commenced their questioning. They told the defendant why he had been arrested and showed him the warrant. Initially, the defendant stated that he never had lived in Boston and had never owned or operated a fruit store there. Lugo told him that it was ridiculous to deny those matters because the Boston police had a number of witnesses who would establish those facts. Finally, the defendant admitted that he had lived in Boston and owned a fruit store. Because in Puerto Rico a confession can reduce a charge, Lugo stated it would be to the defendant's benefit to tell the truth. Lugo made no specific promises to the defendant. The defendant continued to deny any involvement in the crime. At some point, however, the defendant began making statements to the effect that he had killed the girl (McLaurin), but did not remember how or why. He also stated that his intention was "to have sex with" her.

After having acknowledged that he had killed the victim, the defendant denied having killed anyone. He admitted it, then denied it, then admitted it. He later stated that he was an alcoholic and that whatever happened occurred while he was under the influence of alcohol. The defendant stated repeatedly that he killed the victim but that he could not recall the details because he was probably "drunk out of his mind" when he took her "into the back room to have sex with her."

The defendant's common-law wife and stepson arrived at the police station and the interrogation ceased while they visited for about twenty minutes. The police next transported the defendant to a court house to appear before a judge (for the setting of bail). They did not interrogate him. The defendant, however, made small talk with Morales.

After bail was set, the officers transported the defendant to the booking office. On the way, the defendant continued to

make small talk with Morales. On arrival at the booking office, the defendant repeated that he had killed the victim but that he could not recall any details because he had been so drunk. He asked if Lugo could help him. Lugo stated that all he could do was tell the Boston police what the defendant had said.

The judge also made the following findings: "At all times while he was in the custody of the Puerto Rico state police on July 20, 1995, the defendant was sober and alert. In fact, he stated that he had consumed no alcohol on that day. The defendant was not threatened or abused in any way. His treatment by the police was entirely appropriate, and he was allowed to use the bathroom and the telephone on his request. He had no difficulty understanding the officers' questions or in making himself understood. He was completely oriented as to time and space, and was fully aware of his situation. . . . At no time did the defendant exercise his right to remain silent or indicate that he did not wish to answer any further questions. To the extent that Officer Morales may have indicated such in his testimony, I do not accept that as being true. I find that Officer Morales's testimony was confused at times, and part of the problem may have been in the translation. (Officer Morales testified through a Spanish interpreter.) I accept the very clear testimony of Lt. Lugo, who I found to be a credible witness and whose testimony I deem to be accurate, that the defendant *never* indicated that he wished to cease the interrogation. I believe that after being advised of his Miranda rights upon arrival at the police station, the defendant was asked if he wished to speak to the police and his response was that he did not kill the girl. He then continued to speak about the case and never exercised his right to remain silent."

The judge correctly concluded that the Commonwealth satisfied its burden of proving beyond a reasonable doubt both the knowing, willing, and intelligent waiver of Miranda rights by the defendant, and the voluntariness of his statements. See *Commonwealth* v. *Day*, 387 Mass. 915, 921 (1983). As the judge explained, "there was absolutely no indication that the defendant did not want to be questioned," and that when the defendant "continued to talk despite the fact that he fully

understood that he had a right to remain silent, his words and conduct constituted a waiver."

The defendant claims that the record shows that the defendant was coerced by the police to talk because Lugo told the defendant that it would be better for him to talk. There is no merit to this argument. The judge correctly concluded that there was no police coercion. Lugo did not overstep the permissible line in advising the defendant about the consequences of a confession by stating that it would be to the defendant's benefit to tell the truth. See *Commonwealth* v. *Meehan*, 377 Mass. 552, 564 (1979), cert. dismissed, 445 U.S. 39 (1980) ("An officer may suggest broadly that it would be 'better' for a suspect to tell the truth . . . . What is prohibited, if a confession is to stand, is an assurance, express or implied, that it will aid the defense or result in a lesser sentence"). Here, there were no police offers of leniency, see *Commonwealth* v. *Lahti*, 398 Mass. 829, 830 (1986), cert. denied, 481 U.S. 1017 (1987), nor were there police assurances that the confession would help the defendant's defense, see *Commonwealth* v. *Meehan*, *supra* at 564-568.

There is also no merit to the defendant's contention that the judge erred in concluding that the Commonwealth had proved that he had waived his Miranda rights. In support of this argument, the defendant states that he refused to sign a Miranda waiver and that the judge improperly discounted Morales's testimony that the defendant indicated during the interrogation that he wished to "invoke his Fifth Amendment right against self-incrimination." The judge correctly concluded that the absence of a written waiver is not dispositive on the issue; that the defendant may, and did, make a valid, oral waiver. See *Commonwealth* v. *Hine*, 393 Mass. 564, 569 (1984), and cases cited ("the fact that the defendant did not sign the Miranda card does not vitiate his oral waiver"). As to Morales's testimony, the judge expressly discredited it. It is inappropriate for this court, whose Justices were not present at the evidentiary hearing, to reverse such a credibility determination. *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990). Further, when there

is conflicting testimony,[3] a judge's resolution of such conflicting testimony invariably will be accepted. *Id.* The defendant's motion to suppress his statements was correctly denied.

3. The Commonwealth tried the case on the theory that the defendant murdered McLaurin because he was sexually frustrated, having failed in his attempt to rape McLaurin's neighbor, Gomez, several minutes before. The defense was that the Commonwealth had failed to prove beyond a reasonable doubt that the defendant was the murderer. The defense also pointed out inadequacies in the police investigation and argued that the defendant's confession was suspect. With this overview in mind, the challenged remarks by the prosecutor in his closing argument are reviewed in the context of his entire argument, the judge's instructions to the jury, and the evidence at trial. See *Commonwealth* v. *Viriyahiranpaiboon*, 412 Mass. 224, 231 (1992), and cases cited.

(a) The defendant argues that the prosecutor impermissibly appealed to the jury's sympathy for McLaurin. He challenges the prosecutor's quote attributed to the defendant by one of the trial witnesses (Sergio Gonzalez), namely, "Get out of here. I want to fuck this girl [McLaurin]." Defense counsel did not object. This statement by the prosecutor was permissible; he argued the evidence, the testimony of a trial witness. See *Commonwealth* v. *Lamrini*, 392 Mass. 427, 431 (1984). That trial witness, Gonzalez, testified that after the defendant attempted to rape Gomez, he (Gonzalez) went to the fruit store to warn the defendant, who was his friend, not to return to Gomez's apartment. Gonzalez testified that the defendant told him, "Don't worry about it. I just gonna try to fuck this girl," and told him to go and come back later.

(b) Considering the strength of the Commonwealth's case and the judge's instructions to the jury, the prosecutor's remark, "And imagine the horror, the terror, the fear rushing through [the victim] when [the defendant] closed that door," is unlikely to have influenced the jury's verdict. See *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).

---

[3]In this case, the judge found that Morales's testimony was confused. The record reflects that portions of Morales's testimony, if not discredited, would have conflicted with Lugo's testimony.

(c) It was not improper for the prosecutor to recreate for the jury how McLaurin's death occurred, "And [the defendant] squeezed and he squeezed and he squeezed, sucking every air in that twenty-one-year old body out of [the victim]." There was no error; the prosecutor argued the evidence and fair inferences therefrom (there was evidence that the victim died of strangulation). That the argument was unpleasant is not of consequence, as the manner of the victim's death was relevant, as was her age, on the issue whether the murder was committed with extreme atrocity or cruelty. See *Commonwealth* v. *Judge*, 420 Mass. 433, 451-452 (1995).

(d) The defendant's objection to the prosecutor's remark that the defendant "made sure that [the victim] never saw her mother, her fiancé, never returned to her room again, never got married, and never made it to her future mother-in-law's house that afternoon," should have been sustained. The remark, however, did not amount to prejudicial error. The prosecutor did not continue this line of argument, and the judge instructed the jury that "[e]motion or sympathy for one side or the other have no place in these proceedings." The Commonwealth's case against the defendant was compelling. The isolated remark is unlikely to have influenced the jury's verdict. See *Commonwealth* v. *Flebotte*, *supra* at 353.

4. The defendant's trial counsel objected to the judge's reasonable doubt instruction which generally tracked the instruction set forth in *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850). The defendant argues that "[i]t is now time for this Court to finally overturn the well-known but outdated, so-called *Webster* reasonable doubt standard." We decline the invitation. We adhere to what was recently stated in *Commonwealth* v. *Watkins*, 433 Mass. 539, 546-547 (2001):

> "Because the *Webster* charge, apart from the term 'moral certainty,' defines reasonable doubt in a manner that conveys to a jury the need to determine guilt based solely on all evidence and to a state of near certitude, and avoids language that would permit conviction by a lesser standard of guilt or on factors other than the courtroom proof, the charge has always been, and remains today, the preferred and adequate charge on the Commonwealth's burden of

proof. Put differently, a charge defining reasonable doubt in accordance with the *Webster* model, accompanied by the other usual features of a charge to a jury in a criminal case (namely, the presumption of innocence; the necessity to decide the case solely on all the evidence and without regard to sympathy, emotions, or the advocacy of the lawyers; and the nature of the various types of evidence and how to evaluate them), avoids any reasonable likelihood that a jury would understand 'moral certainty' to be something disassociated from the evidence, and prevents the jury from disregarding the high standard of proof required or from improperly determining guilt based on the ethics or morality of the defendant's conduct.'' (Footnote omitted.)

5. We conclude that there is no reason to exercise our power under G. L. c. 278, § 33E, to order a new trial or to direct entry of a lesser degree of guilt on the murder conviction.

*Judgments affirmed.*