NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11339

COMMONWEALTH  vs.  EDMOND J. CARRIERE, JR.

Barnstable.     May 9, 2014. - October 28, 2014.

Present:  Spina, Cordy, Duffly, & Lenk, JJ.

Homicide.  Joint Enterprise.  Evidence, Joint venturer,
    Testimonial statement, Pattern of conduct, Subsequent
    misconduct, Prior misconduct, Motive, State of mind,
    Declaration against interest.  Constitutional Law,
    Confrontation of witnesses.  Practice, Criminal, Capital
    case, Confrontation of witnesses, Argument by prosecutor,
    Presumptions and burden of proof.


Indictment found and returned in the Superior Court
Department on July 13, 2010.

    The case was tried before Robert C. Rufo, J.


    Neil L. Fishman for the defendant.
    Julia K. Holler, Assistant District Attorney, for the
Commonwealth


    DUFFLY, J.  On January 3, 1980, at approximately 8 P.M., the

victim, who was the defendant's wife, was found dead on the

bathroom floor in her home in Bourne.  She had died "quite some

time" earlier of multiple stab wounds.  When the victim's body

was discovered, the defendant and his fourteen year old daughter, who lived with the victim, were in Florida visiting one of the defendant's older daughters. In June, 2005, Steven Stewart, the man who stabbed the victim, was convicted of murder in the first degree; this court reversed his conviction in 2009 based on errors in the admission of testimony by a key witness. See Commonwealth v. Stewart, 454 Mass. 527, 527-528 (2009). The defendant was indicted in July, 2010, after Stewart entered into a plea agreement under which he pleaded guilty to manslaughter, agreed to testify against the defendant, and was sentenced to time served.

The Commonwealth's theory at trial was that the defendant, who was in the midst of a highly contentious divorce from the victim, had engaged in a murder-for-hire scheme with Stewart and their mutual friend Richard Grebauski.[1] Grebauski, the alleged middleman, arranged to hire Stewart for $5,000 after accepting the defendant's offer of $10,000 to kill his wife. The Commonwealth's case relied heavily on evidence introduced through Stewart, who testified both to his own actions and to out-of-court statements by other asserted members of the joint venture, including Grebauski. The remainder of the evidence was based largely on out-of-court statements introduced by witnesses to

---

[1] Richard Grebauski also was indicted for murder, but died in 2004, prior to his trial.

those statements, such as the defendant's friends and neighbors Russell Breault, Charles Berryman, and David Phinney. A police report and a letter sent to the police, containing additional statements, were introduced in evidence by stipulation. In May, 2012, a Superior Court jury found the defendant guilty of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty. See G. L. c. 265, § 1.

On appeal, the defendant challenges the admission of a number of out-of-court statements introduced through Stewart's testimony under the joint venture exception to the hearsay rule; the defendant contends that the Commonwealth did not prove the existence of a joint venture, and also that some of the statements were made outside the period in which the joint venture allegedly occurred. The defendant maintains further that errors in the admission of impermissible and highly prejudicial propensity evidence, the judge's decision not to allow testimony concerning purportedly exculpatory statements made by Grebauski, and improper remarks in the prosecutor's closing argument require a new trial. The defendant objected to certain of the evidentiary rulings and to some of the prosecutor's remarks at trial; other asserted errors were unpreserved. The defendant also requests that we exercise our authority under G. L. c. 278, § 33E, to grant him a new trial.

We conclude that there was no prejudicial error or

substantial likelihood of a miscarriage of justice in any of the challenged evidentiary rulings, or in the prosecutor's closing argument. After careful review of the record pursuant to G. L. c. 278, § 33E, we discern no reason to order a new trial or to reduce the degree of guilt.

Trial evidence. We recite facts the jury could have found, reserving additional detail for later discussion.

In the months prior to the killing, the defendant and his wife were engaged in a hotly contested divorce. The defendant told a number of his friends that his wife intended to take the marital home and "everything else" in the divorce. At one point, he told Grebauski, in Stewart's presence, that he had offered his wife money to "just go away," but she refused. Approximately two to three months before the victim was killed, the defendant, Breault, and Berryman were at Berryman's house, drinking beer, when the defendant asked if they wanted to "make some money." When Berryman responded affirmatively, thinking the defendant meant a job installing vinyl siding, the defendant explained that it was not a siding job, but that he would pay $2,000 for killing his wife, because she was going to take everything in the divorce. The defendant also said that, "[i]f [his] wife takes a dime, . . . he would pay $1,000 to get it back." Breault and Berryman thought that the defendant was joking. At some point either during or shortly after this conversation, Phinney

arrived.

In December, 1979, when the defendant was at Grebauski's house, he asked if Grebauski "knew anyone big, big and black that would go in there and do things to his wife that she would never forget" while the defendant was in Florida with his fourteen year old daughter, Ginger Kirby.  Both Stewart and Shannon Glover Grebauski, Grebauski's then girl friend,[2] heard the defendant talking about the divorce and his desire that his wife were dead.

At some point thereafter, Grebauski approached Stewart, saying that he "[had] a deal for" Stewart, and that the defendant had offered Grebauski $5,000 to kill the defendant's wife. Stewart initially declined the offer, but, after continued "prodding" by Grebauski, eventually agreed to kill the defendant's wife because he owed Grebauski $500 for purchases of cocaine.  Approximately a week before the victim was stabbed, Stewart told his friend Stephen Tracy that "Grebauski had somebody who wanted him to do his old lady."

Around December 10, 1979, a week before school vacation was to begin, the defendant and his daughter Kirby, who lived with the victim, left to visit the defendant's older daughter, Linda McCraney, who lived in Florida.  Kirby stayed with McCraney in

---

[2] At the time of the stabbing, Richard Grebauski and Shannon Glover had been living together for approximately ten years. They married in February, 2003.

McCraney's mobile home,[3] and the defendant stayed with his girl friend and her family. During that time, the defendant made a number of derogatory comments about his wife, including telling McCraney several times that her mother "was a whore" who was sleeping with everyone on Cape Cod, and that, "if [she] continued with the divorce she would be sorry for what she had done." McCraney thought that her father and sister would return to Massachusetts before school resumed on January 3 or 4, 1980, but, on January 3, they had not left and showed no signs of leaving. When McCraney asked the defendant about his plans, the defendant said that "it was none of [her] goddamn business and that he [would] leave whenever he[ was] ready to leave."

On January 3, 1980, the day planned for the killing, Stewart went to Grebauski's house. Grebauski received a telephone call from the defendant in Florida; the defendant said that "it had to be done that night" because Kirby needed to return to school. Grebauski gave Stewart one of two fillet knives that were kept on the kitchen windowsill, and a pair of gloves. Grebauski told Stewart that the victim would be alone in the house, because her son would be working and her daughter was in Florida. He told Stewart to just walk into the house and stab the victim in the heart.

When Stewart drove to the victim's house for the first time

---

[3] The defendant owned the mobile home.

that evening, no one was at home; he went to a nearby grocery store parking lot and returned shortly thereafter to see a vehicle in the driveway. He entered as Grebauski had instructed, and found the victim upstairs in the bathroom. He started to choke the victim, and she slipped and hit her head on the radiator. Stewart then stabbed the victim in the heart and left her on the floor with her head leaning up against the side of the tub. While he was moving the victim's body, he inadvertently cut her arm. He threw the knife and gloves in the Cape Cod canal, then drove to his grandmother's house in Brockton, where he telephoned Grebauski to tell him that "it's done." Grebauski came to the grandmother's house, and he and Stewart discussed plans for an alibi; Stewart planned to say that he had been with Grebauski in Brockton when the victim was killed. Grebauski said that he could not pay Stewart until the defendant returned from Florida.

That same day, Berryman telephoned the defendant in Florida, looking for Phinney. Berryman and Phinney had been working on a vinyl siding job which was almost completed when Phinney suddenly departed for a week-long vacation in Florida. When the client contacted Berryman, angry that the job was not finished, Berryman attempted to reach Phinney at the defendant's house in Florida. Berryman asked Phinney when he would be returning to Massachusetts to complete the job, and Phinney replied, "It

hasn't happened yet, but it's going to happen tonight. Listen to your radio, watch the TV. She's going to die tonight."[4]

Edmond Carriere, III, the son of the victim and the defendant,[5] contacted McCraney and Kirby in Florida to tell them that their mother had been killed; they flew to Massachusetts, while the defendant drove back. At the victim's funeral service, the defendant did not go inside the church, but remained outside, sitting near his parked car. Kirby testified that the family did not want the defendant at the funeral because they believed that he had harmed the victim.

At some point shortly after the victim's death, Stewart and Grebauski were playing pool in Grebauski's house when the defendant telephoned to say he was coming over with the money. When the defendant arrived, he said he was pleased that his wife was dead ("the bitch was out of the way"), but was very angry that his son had not been killed and that the body had not been removed from the house so that it would not be discovered. After an angry exchange during which the defendant told Grebauski he

---

[4] At trial, David Phinney testified that he did not tell Charles Berryman to watch for news of the victim's death until after he had received notice the following day that she had been killed; Phinney said he told Berryman to watch the television news to get more information about the killing if he had not heard the details.

[5] Edmond Carriere, III, who was approximately twenty-two years old at the time of the victim's death, lived with the victim and his fourteen year old sister. For simplicity, we refer to Edmond by his first name.

would not pay all of the agreed amount, the defendant and Grebauski resolved their differences and the defendant threw $10,000, in a stack of bills bound in an elastic band, onto the pool table. When the defendant left, Grebauski and Stewart had a heated discussion about the amount Stewart would be paid. Stewart had believed that the full amount offered by the defendant was $5,000, not $10,000. Eventually, Stewart agreed to accept $4,500 for the killing, representing the $5,000 Grebauski had discussed, minus a $500 deduction for the cocaine debt.

A few months after the victim was killed, Berryman encountered the defendant on the driveway at Phinney's house. The defendant approached Berryman, put his arm around Berryman's shoulder, and said, "Charlie, I hear you're doing a lot of flapping." When Berryman inquired what the defendant meant by this, he responded, "You know what I mean. You keep it up, you're going to end up just like my wife."

Several years after the victim's death, in 1994, the defendant encountered Edmond and Edmond's wife, Sharon Cope Carriere, at a fair in the Onset section of Wareham. The defendant approached them, but Edmond refused to speak to him, claiming that the defendant was not his father. The defendant then engaged in a loud and angry verbal confrontation with Cope Carriere, saying, among other things, that Edmond had had a sexual relationship with his mother and should have been killed

with her.

Discussion. 1. Standard of review. The defendant challenges the introduction or exclusion of testimony to which there was an objection at trial, as well as testimony which was introduced without objection. Where the error was preserved, we review for prejudicial error and consider "whether there is a reasonable possibility that the error might have contributed to the jury's verdict." Commonwealth v. Alphas, 430 Mass. 8, 23 (1999). The Commonwealth "bears the risk of doubt when any exists as to the error being nonprejudicial." Id. Reversal is not necessary if the error "did not influence the jury, or had but very slight effect." Commonwealth v. Cruz, 445 Mass. 589, 591 (2005), quoting Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994). Where the error was unpreserved, we review for a substantial likelihood of a miscarriage of justice. Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014).

2. Admission of out-of-court statements. "Out-of-court statements by joint venturers are admissible against the others if the statements are made during the pendency of the criminal enterprise and in furtherance of it." Commonwealth v. Burton, 450 Mass. 55, 63 (2007). See Commonwealth v. Bongarzone, 390 Mass. 326, 340 (1983). Such statements of coventurers are considered to be reliable, and are deemed "equivalent to a statement by the defendant." Commonwealth v. Stewart, 454 Mass.

527, 535 (2009), citing Commonwealth v. White, 370 Mass. 703, 708 (1976). Before statements by coventurers may be admitted, the Commonwealth first must establish the existence of the joint venture (and the defendant's involvement in it) by a preponderance of the evidence, independent of the out-of-court statements. Commonwealth v. Cruz, 430 Mass. 838, 844 (2000). See Commonwealth v. White, supra at 709 n.7. If the judge is satisfied that the Commonwealth has met this burden, the statement may be admitted, and the jury are instructed that they may consider the statements only if they find that a joint venture existed independent of the statements, and that the statements were made in furtherance of that venture. See, e.g., Commonwealth v. Bright, 463 Mass. 421, 427 (2012); Commonwealth v. Burton, supra; Commonwealth v. Silanskas, 433 Mass. 678, 693 (2001); Commonwealth v. Cruz, supra at 844-846.

Here, numerous out-of-court statements made by Grebauski, Stewart, and Phinney were introduced under the joint venture exception to the hearsay rule, the majority through Stewart's testimony. The defendant argues that the Commonwealth did not establish the existence of a joint venture between the defendant and Grebauski, Stewart, or Phinney, and therefore that many of the out-of-court statements should not have been admitted. The defendant argues also that, even if the evidence was sufficient to establish a joint venture between himself, Grebauski, and

Stewart, Grebauski's statements should not have been admitted because they were testimonial and introduced in violation of Crawford v. Washington, 541 U.S. 36, 53-54 (2004).

Turning first to this later argument, the claim is unavailing. A defendant's right under the Sixth Amendment to the United States Constitution to confront the witnesses against him, see Crawford v. Washington, supra, "does not bar the admission of statements that a reasonable person in the position of the declarant would not objectively foresee as being used in the investigation or prosecution of a crime." Commonwealth v. Burton, supra at 63-64, citing Commonwealth v. Gonsalves, 445 Mass. 1, 12-13 (2005), cert. denied, 548 U.S. 926 (2006). This inquiry looks to the intent of the declarant and the specific circumstances of the statement. See Commonwealth v. Gonsalves, supra at 12. "Certainly, just after the murder, in the privacy of [a residence], neither [coventurer] would have reasonably foreseen [his] statements being used in the investigation or prosecution of a crime." Commonwealth v. Burton, supra at 64. "Many other jurisdictions have reached a similar conclusion, holding in general that statements of joint venturers (or coperpetrators or coconspirators) are the type of remarks that the Crawford Court deemed nontestimonial." Id. See Crawford v. Washington, supra at 56 ("statements in furtherance of a conspiracy" are not testimonial).

a.  Evidence of existence of joint venture.  The defendant challenges as improper hearsay testimony the introduction of Stewart's description of statements Grebauski made to him concerning the defendant's plan to kill his wife, particularly that, on the night of the killing, Grebauski told Stewart that the defendant had said during a telephone call from Florida that "it had to be done that night" because the defendant's daughter had to return to school.  The defendant also contests testimony by Stewart's friend Stephen Tracy describing what Stewart told him about someone wanting Grebauski "to do his old lady" a few weeks before the victim's death; Berryman's testimony regarding the substance of the telephone call with Phinney in Florida on the day of the stabbing; and State police Sergeant Paul White's testimony that Phinney told him that he went to Florida in part to provide an alibi for the defendant.  The defendant filed a motion in limine to exclude Tracy's testimony, and thereafter objected when it was introduced at trial.  Defense counsel objected to portions of Stewart's and Berryman's trial testimony; the defendant did not object to White's testimony.

The Commonwealth maintains that the evidence of joint venture was stronger in this case than in Commonwealth v. Stewart, supra at 534-536, in which the court concluded that there was sufficient evidence of a joint venture between the defendant, Grebauski, and Stewart, but insufficient evidence of

Phinney's involvement.

We conclude that the evidence in this case was more than sufficient to permit the jury to find that the defendant entered into a joint venture with Grebauski and Stewart to kill his wife. Therefore, save for a few exceptions that we discuss infra, the statements by Grebauski and Stewart were admissible as made in furtherance of the joint venture to kill the defendant's wife.[6] See Commonwealth v. Bright, supra at 426-427; Commonwealth v. Stewart, supra. Moreover, the defendant's own statements made in furtherance of the joint venture to kill his wife are not hearsay, and were admitted properly. See Commonwealth v. Bright, supra at 426 n.8, citing Commonwealth v. Marshall, 434 Mass. 358, 365-366 (2001).

_____

[6] Because the testimony concerning Phinney's knowledge of the joint venture was scant, limited, and contradictory, however, and, in any event, no testimony was introduced to establish that Phinney shared the intent to kill the victim, the evidence was insufficient to establish a joint venture between the defendant and Phinney, or between Phinney and Grebauski or Stewart. Therefore, Berryman's testimony concerning Phinney's statement over the telephone, "It hasn't happened yet, but it's going to happen tonight. Listen to your radio, watch the TV. She's going to die tonight," should not have been admitted. The objected-to admission of this evidence, however, did not result in prejudicial error. The statement was cumulative of substantial other evidence of the defendant's plan to kill the victim on January 3, and also was cumulative of other evidence that Phinney unexpectedly traveled to Florida with his family a few days previously, inferably in part to provide an alibi for the defendant. Moreover, at trial, Phinney denied having made the statement, and said that he had told Berryman after being notified of the victim's death to watch the news for further details if Berryman did not already know them. See note 4, supra.

b. Scope of joint venture. We turn to consideration of particular statements that the defendant contends, even if we conclude that there was sufficient evidence of a joint venture, were beyond its scope. The defendant maintains that certain statements were inadmissible because they were made before the joint venture was formed, or after it ended. See Commonwealth v. Andrews, 403 Mass. 441, 452 (1988) (statements of joint venturer not admissible after joint venture has ended). The inquiry to determine if a statement is made during the pendency of the joint venture, however, "focuses not on whether the crime has been completed, but on whether a joint venture was continuing." Commonwealth v. Stewart, supra at 537, citing Commonwealth v. Braley, 449 Mass. 316, 322 (2007). Statements made prior to the formation of a joint venture may be admissible if they were made in furtherance of a joint venture that formed thereafter. See Commonwealth v. McLaughlin, 431 Mass. 241, 248 (2000) ("Matters surrounding the history of the conspiracy, including statements of coconspirators, may be admissible even if they predate the conspiracy"). Statements made in an effort to conceal a crime, made after the crime has been completed, may be admissible under the joint venture exception because the joint venture is then ongoing, with a purpose to ensure that the joint venture itself remains concealed. See Commonwealth v. Braley, supra at 322; Commonwealth v. Anderson, 445 Mass. 195, 211 (2005), quoting

Commonwealth v. Colon-Cruz, 408 Mass. 533, 543 (1990).

The defendant challenges Stewart's testimony about Grebauski's initial $5,000 offer, and Tracy's statement that Stewart said Grebauski had someone who wanted Grebauski to "do his old lady" as having been made before the joint venture was formed. The challenged statements, however, were probative of the defendant's intent to kill his wife and of the defendant's, Stewart's, and Grebauski's actions in furtherance of that intent several months later. The judge did not abuse his discretion in determining that these statements concerning the formation of the joint venture were not "too remote to be relevant." See Commonwealth v. McLaughlin, supra; Commonwealth v. Rankins, 429 Mass. 470, 474 (1999).

The defendant also challenges Stewart's testimony regarding the theft of two truckloads of lumber, in which he, the defendant, and Grebauski were involved, as being outside the scope of the joint venture to kill the victim. The testimony was introduced to support a finding that the three would have been involved in a subsequent joint venture to perpetrate the killing. We agree that this testimony should not have been admitted on this ground. The lumber theft took place in 1977, several years before the defendant told his friends and acquaintances that he was seeking someone to kill his wife, and did not form any part of the later joint venture to perpetrate the killing. The

testimony about another criminal enterprise in which the defendant was involved thus was not relevant to any issue in the case, and served only to suggest that the defendant was likely to engage in criminal activity. Because the Commonwealth contends in its brief that the testimony was also admissible to show motive and intent, we reserve for later discussion, see part 4, infra, our consideration whether the admission of this unobjected-to testimony was error resulting in a substantial likelihood of a miscarriage of justice.

3. Propensity evidence. The defendant asserts that certain of his statements and testimony concerning his conduct after his wife's death should not have been admitted because the evidence was more prejudicial than probative and was introduced merely to paint a negative portrait of his character. We consider each challenged statement in turn.

a. Statements that defendant wanted his son killed. The defendant asserts error in the admission of testimony that, in addition to his wife, the defendant sought to have his son killed. This evidence included testimony by Stewart that when Grebauski initially made the $5,000 offer to Stewart to kill the defendant's wife, Grebauski said that the defendant also wanted his son killed, but Stewart refused to have anything to do with the son or with moving the wife's body. The evidence also included testimony by Stewart that, at Grebauski's house after

the stabbing, the defendant was reported to have been angry that his son had not been killed; and testimony by the defendant's daughter-in-law that, in 1994, she and the defendant's son encountered the defendant at a fair in Onset, where the defendant told the son that he should have been killed just like his mother. The Commonwealth sought to introduce this evidence under the joint venture exception, maintaining that a plan to kill the defendant's son was part of the joint venture between Stewart, Grebauski, and the defendant to kill his wife. In its brief, the Commonwealth asserts also that the evidence is relevant to the defendant's motive to kill his wife. The defendant did not object to the admission of most of this testimony at trial, but did object to certain statements.

We conclude that the evidence was not sufficient to support the existence of a joint venture to kill the defendant's son. The only evidence of the defendant's solicitation of participants in a joint venture to kill his son, or of others' possible agreement to participate in such a venture, was introduced through Stewart. Stewart testified that, when Grebauski initially had asked him about killing the defendant's wife, Stewart told Grebauski that he refused to have anything to do with killing the son or moving the wife's body. The plan between Grebauski and Stewart proceeded with the killing of the defendant's wife. Stewart also testified that he "assumed" that

the conversation about the son meant that the defendant and Grebauski had discussed the matter previously. Stewart further testified that, after the killing, Grebauski said the defendant was angry that the son had not been killed and the wife's body had not been moved. Because Stewart explicitly refused to participate in any plan to kill the son (which apparently went by the wayside upon Stewart's refusal), Stewart was not a member of a joint venture to kill the son, and his statements about any such venture, if one existed, do not fall under the joint venture exception to the hearsay rule.

Nor was there sufficient evidence independently to support the existence of a joint venture to kill the defendant's son. The only evidence of such a joint venture was the hearsay statements by Stewart. The statements by the defendant at the fair in Onset, years after the killing, that his son should have been killed like the defendant's wife, do not indicate anything about the defendant's involvement in a joint venture years earlier that might have been formed with an intent to kill the son.

The Commonwealth asserts also that the defendant's hostility toward his son is probative of the defendant's hostility toward the victim. Evidence of a defendant's hostility towards his spouse may be admissible to show a defendant's motive to kill the spouse. See Commonwealth v. Dung Van Tran, 463 Mass. 8, 15

(2012). Here, however, evidence of the defendant's hostility towards his son does not render the desired inference of the defendant's hostility toward the victim and intent to kill her more probable than it would have been absent such evidence without asking the jury to make impermissible inferences concerning the defendant's character. See Commonwealth v. Fayerweather, 406 Mass. 78, 83 (1989). The defendant's motive to kill his wife is unrelated to any motive he may have had to kill his son. The two crimes were separate and distinct. The evidence of the defendant's motive to kill his wife hinged on her refusing to give him a divorce or to accept money to "just go away," and the defendant's belief that his wife would take everything he owned in a divorce. There was no such motive for the defendant to want to kill his son. Furthermore, statements made years after the victim's death were not, as the Commonwealth argues, "part and parcel" of the plan to kill the defendant's wife. We agree that the evidence that the defendant said he wanted his son killed was more prejudicial than probative.

Moreover, the evidence was not crucial to the Commonwealth's case. Although the evidence of the defendant throwing $10,000 on the pool table, and his argument with Grebauski about whether the whole amount should be paid, was part of the course of the joint venture, the argument also involved the defendant's expressed anger over the manner in which the victim had been killed, and

the fact that her body had not been removed from the house as he had told Grebauski he wanted done.  Likewise, Stewart's argument with Grebauski over the $5,000 he believed had been offered for the stabbing, and the amount of $10,000 that the defendant had discussed with Grebauski, did not involve the defendant's son.  Thus, the Commonwealth could have presented its case effectively without statements about a hypothetical crime that never occurred.

Nonetheless, given the extensive, properly admitted testimony about the defendant's statements that he wanted his wife killed, and his efforts to hire someone to do so; his trip to Florida and his statements while in Florida; and his actions following the victim's death, the admission of the testimony concerning the defendant's statements about his son was unlikely to have influenced the jury's verdict.  See Commonwealth v. Ortiz, 435 Mass. 569, 578-579 (2002).

b.  Evidence of defendant's hostility toward victim.  The defendant contends also that other testimony, both objected to and not objected to at trial, was unduly prejudicial and introduced to attack his character by portraying him as what the defendant characterizes as an "evil" man who did not like his family (a "cold monster or devil . . . who cared so little about his wife and children").  The challenged testimony includes the statement by the defendant's daughter McCraney that the defendant

said her mother was a "whore" who was engaging in sex with "everyone on Cape Cod"; that while McCraney and the defendant's younger daughter flew back from Florida upon being told of the victim's death, the defendant instead chose to drive back; and that the defendant did not attend his wife's funeral. The defendant also challenges the admission of statements by Glover Grebauski, Grebauski's then girl friend, that, approximately one month before the stabbing, the defendant had asked if Grebauski "knew anyone big, big and black that would go in there and do things to his wife that she would never forget." The Commonwealth maintains that this evidence was admitted properly to show the defendant's state of mind and intent toward the victim, and that the judge's instruction on prior bad acts was sufficient to cure any prejudice.

Evidence of a defendant's adversarial or hostile relationship with a spouse may be admissible to show a defendant's motive to kill the spouse. See, e.g., Commonwealth v. Dung Van Tran, 463 Mass. 8, 15 (2012) (evidence that defendant was abusive to estranged wife and children and had threatened to kill them prior to starting fire in wife's house was admissible because it "tended to show the defendant's long-standing and persistent anger and hostility toward" his family and thus was relevant to establish motive and intent); Commonwealth v. Mendes, 441 Mass. 459, 464 (2004) (defendant's use of cocaine and

association with prostitutes admissible to show motive to kill wife, because it supported inference that defendant would seek money from wife's inheritance to support these habits); Commonwealth v. Hunter, 416 Mass. 831, 837 (1994), S.C., 427 Mass. 651 (1998) (out-of-court statements concerning witness's conversation with victim admissible to show hostile relationship between defendant and victim, in order to establish defendant's state of mind and motive to kill victim); Commonwealth v. Gil, 393 Mass. 204, 215 (1984) (evidence of hostile relationship between defendant and spouse may be admissible as relevant to defendant's motive to kill spouse).

Although the derogatory statements about the defendant's wife were prejudicial to the defendant, they were not unfairly prejudicial.  The defendant's intent, and his participation in the planning of the killing that was carried out by Stewart and Grebauski, were key issues in the case, and the statements were clearly probative on those issues.  See Commonwealth v. Carey, 463 Mass. 378, 387-388 (2012).  The statement concerning "someone big, big and black," who would do things his wife would never forget, is similarly relevant to the defendant's state of mind and his hostility toward the victim.  Although, as the defendant emphasizes, the statement contained both racial and sexual overtones, it was not of such an unduly inflammatory nature as to require a conclusion that the judge abused his discretion in

allowing its admission, where its probative value concerning the defendant's state of mind was strong. See Commonwealth v. Olsen, 452 Mass. 284, 294 (2008) (that evidence on material matter is "gruesome" or "inflammatory" does not necessarily render it inadmissible). There was also no error in the judge's decision to permit the introduction of evidence that the defendant drove rather than flew home after being informed of his wife's death, and that he did not attend the victim's funeral. Evidence of a defendant's behavior after a victim's death may be admissible where it is probative of the defendant's mental state at the time of the killing. See Commonwealth v. Mendes, supra at 466-467; Commonwealth v. Cardarelli, 433 Mass. 427, 434 (2001).

4. Prior bad acts. Stewart testified that, approximately two years before the killing, he and Grebauski stole two truckloads of lumber from a lumberyard in Wareham, at the behest of the defendant, with Stewart acting as the driver, and that Grebauski paid him $2,500 for the job. In addition to his argument that testimony concerning the theft of the two truckloads of lumber was beyond the scope of the joint venture, see part 2, supra, the defendant argues that the testimony was not relevant to any issue in the case, and was introduced impermissibly only to attack his character.

Evidence of prior bad acts "is not admissible to show a defendant's bad character or propensity to commit the charged

crime." Commonwealth v. Dwyer, 448 Mass. 122, 128 (2006).  It may, however, "be admissible if relevant for other purposes such as 'common scheme, pattern of operation, . . . identity, intent or motive.'"  Id., quoting Commonwealth v. Marshall, 434 Mass. 358, 366 (2001).  See Commonwealth v. Beneche, 458 Mass. 61, 80 (2010) (evidence of misconduct or prior bad acts may be admissible to show defendant's motive, intent, or state of mind).  Even if such evidence is relevant for other purposes, its probative value must not be substantially outweighed by its prejudicial effect.  See Commonwealth v. Sylvia, 456 Mass. 182, 192 (2010); Mass. G. Evid. § 403 (2014).

We conclude that, in addition to not supporting the formation of a later joint venture to kill the defendant's wife, the testimony concerning the lumber theft also should not have been admitted to show motive or intent.  The lumber theft was too remote in time to make the formation of a joint venture between the defendant, Stewart, and Grebauski to kill the victim more likely, and bore little, if any, probative value on a motive to kill the victim.  It served therefore merely to paint the defendant as someone prone to criminal activity.

Nonetheless, there was no substantial likelihood of a miscarriage of justice in the erroneous admission of this evidence.  In the context of the other evidence at trial concerning the brutal killing and the victim's efforts to defend

herself, the theft of materials from a lumber yard was a relatively minor offense. Furthermore, Stewart testified that Grebauski, who was "into everything," and not the defendant, paid him to be a driver in the lumber yard theft. Moreover, defense counsel made use of the lumber theft evidence as part of his defense strategy. In both opening statement and closing argument, defense counsel argued that Grebauski, not Stewart, killed the victim, and that the lumber theft gave Grebauski an independent motive to want the victim dead, because both the victim and the defendant's son Edmond were planning to testify against Grebauski at his upcoming trial on charges stemming from the lumber theft.[7]

5. Exclusion of statement by deceased joint venturer. The defendant argues that his right to due process was violated when the judge denied his motion to admit, as a statement against penal interest, testimony from David Mello that, while he and his friend Grebauski were driving past the victim's house at some point within a month of the stabbing, Grebauski said, "See that white house there? I offed the bitch. She was getting to be too much trouble and I killed her. I had to wait until her daughter went to Florida with her father before I could kill her."

A defendant has a constitutional right to present a defense,

---

[7] Testimony suggested that the defendant was estranged from Edmond in part because of Edmond's plan to testify against Grebauski.

and to offer evidence that another person committed the crime. See Commonwealth v. Galloway, 404 Mass. 204, 208-209 (1989); Commonwealth v. Jewett, 392 Mass. 558, 562 (1984). An out-of-court statement "is admissible under the penal interest exception if (1) the declarant's testimony is unavailable; (2) the statement so far tends to subject the declarant to criminal liability that a reasonable person in his position would not have made the statement unless he believed it to be true; and (3) the statement, if offered to exculpate the accused, is corroborated by circumstances clearly indicating its trustworthiness." Commonwealth v. Charles, 428 Mass. 672, 677 (1999), citing Commonwealth v. Drew, 397 Mass. 65, 73 (1986). A judge determining whether to admit such a statement "should not base his determination on an assessment of the proffered witness's credibility," but rather should consider several factors, including the relationship between the declarant and the witness, the reliability and character of the declarant, and "the credibility of the declarant and the credibility and probativity of his statement" to assess whether "there is some reasonable likelihood that the statement could be true" given the other evidence. Commonwealth v. Drew, supra at 75-76 (citation omitted). Where the question of corroboration of the declarant's credibility or trustworthiness is a close one, a judge should err in favor of allowing the statement to be admitted. See

Commonwealth v. Tague, 434 Mass. 510, 516-517 (2001), cert. denied, 534 U.S. 1146 (2002) (judges should favor admission of statements against penal interest and leave assessments of credibility and weight to jury).

The judge denied the motion to admit Mello's testimony on the ground that Grebauski's statement did not meet the third prong of the requirements for a statement against penal interest, that the statement be corroborated by circumstances clearly indicating its trustworthiness. See Commonwealth v. Charles, supra. The judge noted that, in addition to being Mello's cocaine supplier, Grebauski had engaged in a number of criminal ventures with Mello, including selling drugs, stealing, and automobile theft. He concluded that there was no corroborating evidence, and that nothing in the circumstances indicated the proffered testimony was trustworthy. Given a defendant's constitutional right to present exculpatory evidence, and that, in considering a statement against penal interest, "[t]he jury, rather than the judge, should evaluate the credibility of the witness," Commonwealth v. Drew, supra at 76, Mello's proffered testimony should have been admitted. See Commonwealth v. Tague, supra.

There was no prejudice, however, in the decision not to leave the question of Mello's or Grebauski's credibility to the jury. Grebauski's statement that he "offed" the victim was not

exculpatory and did nothing to undermine the Commonwealth's theory that Grebauski participated in the killing at the defendant's request, while the defendant was the mastermind. Whether Grebauski killed the victim himself, or hired Stewart to do so, did not exculpate the defendant; under either theory of the crime, the defendant asked Grebauski to kill the victim, and paid him for having done so. Given the other evidence of Grebauski's involvement, the statement would have "had but very slight effect" on the jury. Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994), quoting Commonwealth v. Peruzzi, 15 Mass. App. Ct. 437, 445 (1983).

6. Prosecutor's closing argument. The defendant contends that a new trial is required based on two improper aspects of the prosecutor's closing argument. He maintains first that the prosecutor misstated the law and impermissibly shifted the burden of proof by several of his remarks. The defendant maintains further that certain of the prosecutor's comments were highly inflammatory and not based on the evidence, but rather were inappropriate efforts to attack the defendant's character and to portray him as a "mastermind," a "puppet master," and the "architect of a murder for hire" who wished to "envelop" himself in "a cloak of darkness" and a "veil of secrecy."

Prosecutors may not "misstate the evidence or refer to facts not in evidence" or "play . . . on the jury's sympathy or

emotions, or comment on the consequences of a verdict."
Commonwealth v. Kozec, 399 Mass. 514, 516-517 (1987).  They may,
however, argue "forcefully for a conviction based on the evidence
and on inferences that may reasonably be drawn from the
evidence."  Id. at 516.  "Remarks made during closing arguments
are considered in the context of the entire argument, and in
light of the judge's instructions to the jury and the evidence at
trial."  Commonwealth v. Viriyahiranpaiboon, 412 Mass. 224, 231
(1992).  See Commonwealth v. Francis, 450 Mass. 132, 140 (2007).
The absence of an objection at trial may be viewed as "some
indication that the tone [and] manner . . . of the now challenged
aspects of the prosecutor's argument were not unfairly
prejudicial."  Commonwealth v. Mello, 420 Mass. 375, 380 (1995),
quoting Commonwealth v. Toro, 395 Mass. 354, 360 (1985).
"[I]nstructions may mitigate any prejudice in the final
argument."  Commonwealth v. Kozec, supra at 517.

a.  Statements concerning Commonwealth's burden.  As he did
at trial, the defendant challenges certain of the prosecutor's
statements that the defendant maintains were misstatements of law
that shifted the burden of proof away from the Commonwealth, or
that would have resulted in juror confusion as to the standard of
proof necessary for a conviction.  He points particularly to the
prosecutor's comment that it was the jury's duty to "determine
what happened or what didn't happen," and "to determine what

version [of events] is the correct version.  What is it that happened?"  He also challenges the prosecutor's statement that "[t]he term 'verdict' comes from the Latin 'veritas,' truth; and 'dicta,' to speak.  Speak the truth.  Thirty-two years is a long time; and now it's time for you, jurors, to speak the truth."

Following closing arguments, the defendant sought a curative instruction as to these statements.  He argued that telling the jury that their job is to decide "which version is correct . . . shifts the burden," and, "They're not looking for the truth here. They're looking to see whether the Commonwealth has proved their case [beyond a reasonable doubt]."  The judge declined to give such an instruction.  In his final charge, however, the judge instructed:

> "[Y]our function as the jury is to determine the facts of this case.  You are the sole and exclusive judges of the facts.  You alone will determine, What evidence do I accept? How important any evidence is that you do accept.  And what conclusions you can draw from all of the believable evidence in this case.  After that, you must apply the law as I'm going to state it to you to the facts as you have determined them to be in order to decide whether the Commonwealth has, as it must, proven this particular Defendant guilty of the offense known as murder beyond a reasonable doubt."

"It is improper for a prosecutor to equate a guilty verdict with justice."  Commonwealth v. Francis, supra at 140.  See Commonwealth v. Degro, 432 Mass. 319, 328-329 (2000) (request to jury to "do your job" and, implicitly, to find defendant guilty, was not permissible argument).  Even assuming that certain of the

prosecutor's statements could be seen as implicitly urging the jury to do their job and find the defendant guilty, the majority of the prosecutor's statements that the defendant characterizes as burden-shifting did not suggest that the Commonwealth's burden was less than proof beyond a reasonable doubt, or that the jury could do their duty only by reaching a guilty verdict.  Indeed, early in his argument the prosecutor noted that the defendant's counsel had misspoken at one point and suggested that the burden of proof rested on defense counsel; the prosecutor then correctly stated:

> "But many times, he also said the burden is on the Commonwealth.  And folks, make no mistake about that.  That is absolutely 100 percent true.  The burden is on the government here to prove this case to you beyond a reasonable doubt."

The prosecutor's statement regarding the jury's duty to determine what happened, and to seek the truth, were not improper.  See Commonwealth v. Lyons, 426 Mass. 466, 471-472 (1998) (prosecutor may urge jury to "do [their] duties as jurors to return a just verdict").  It is appropriate for counsel to "impress upon the jury their duty to act with . . . impartiality." Commonwealth v. LaCorte, 373 Mass. 700, 707 (1977).

A few of the prosecutor's comments were more questionable. The remark that the jury had to determine which of two stories was the true version of events did not, standing alone, inform the jury that their duty was to decide whether the Commonwealth

had proven the defendant's guilt beyond a reasonable doubt,

rather than to pick between two scenarios proffered by the

attorneys.[8]  Viewed in the context of the prosecutor's entire

closing argument, however, see Commonwealth v. Lyons, supra,

there was no prejudicial error.  See Commonwealth v. LaCorte,

supra (prosecutor's remark that jury were courageous and that he

---

[8] Although the defendant made no mention of this statement, we note that, toward the end of his closing, having summarized the evidence and immediately after his statement that thirty-two years is a long time, the prosecutor said, "Edmond Carriere, Jr. is guilty of murder in the first degree under the theory of deliberate premeditation; and he's guilty of murder in the first degree by extreme atrocity or cruelty."  A prosecutor may not "interject his personal belief in the defendant's guilt" into his closing argument.  See Commonwealth v. Young, 461 Mass. 198, 206 (2012), citing Commonwealth v. Good, 409 Mass. 612, 623 (1991). In the context of the surrounding statements, however, the jury reasonably could have understood this statement as the prosecutor arguing permissibly that they should find the defendant guilty based on the evidence.  See Commonwealth v. Mamay, 407 Mass. 412, 424-425 (1990).  Cf. Commonwealth v. Santiago, 425 Mass. 491, 500 (1997), quoting Commonwealth v. Bradshaw, 385 Mass. 244, 277 (1982) (jury "could be expected to take both arguments with a grain of salt" and would be able to sort out excessive claims made by prosecutor).

In any event, even if the statement were improper, it resulted in no substantial likelihood of a miscarriage of justice.  At the beginning of his closing, the prosecutor himself said that the jury must find the facts and that their collective memories alone would determine what the facts were, not the attorneys' views of the evidence.  Later, before summarizing the evidence, he argued properly, "I'm going to suggest to you, ladies and gentlemen, that you will be convinced beyond a reasonable doubt."  In addition, the closing was followed by the judge's forceful instructions on the attorneys' arguments being merely their view of the evidence, and his instructions on the Commonwealth's burden of proof and the jury's duty to determine the facts and how much, if any, of the witnesses' testimony they believed.

believed they would return truthful verdict not improper).

Immediately before and after making this statement, the prosecutor informed the jury correctly that the Commonwealth had to prove its case beyond a reasonable doubt, and that it was their exclusive province to determine what the facts were. The prosecutor's closing argument was followed by the judge's detailed and proper instructions that explained the Commonwealth's burden to prove the defendant's guilt beyond a reasonable doubt; the instructions also emphasized that opening statements and closing arguments are not evidence. See Commonwealth v. Francis, supra at 140-141 (prosecutor's statement that "justice delayed is justice denied" was improper, but error did not create substantial likelihood of miscarriage of justice because jury knew that thirty years had passed since killing occurred and argument was followed by appropriate jury instructions); Commonwealth v. Viriyahiranpaiboon, supra at 232, and cases cited (where prosecutor made improper burden-shifting comments in closing, defendant must show that effect on jury was sufficiently prejudicial to merit reversal).

b. Inflammatory remarks. "A prosecutor must limit comment in closing statement to the evidence and fair inferences that can be drawn from the evidence." Commonwealth v. Pearce, 427 Mass. 642, 646 (1998), quoting Commonwealth v. Kelly, 417 Mass. 266, 270 (1994). Nonetheless, a prosecutor may argue zealously in

support of inferences favorable to the Commonwealth's case that reasonably may be drawn from the evidence. See Commonwealth v. Johnson, 429 Mass. 745, 748-749 (1999), quoting Commonwealth v. Sanchez, 405 Mass. 369, 376 (1989) ("to the degree the recitation of the evidence was inflammatory, that was inherent in the odious . . . nature of the crime[] committed"). Although forceful, the prosecutor's characterization of the defendant seems to have been based properly on reasonable inferences that could have been drawn from the evidence. The suggestion that the defendant was a "mastermind" and the "architect of a murder for hire" was grounded in the evidence of months of planning by the defendant to arrange his wife's killing in Massachusetts while he was with friends and relatives in Florida; the characterization of the defendant as a "puppet master," while perhaps hyperbolic, also rested on this evidence. See Commonwealth v. Lyons, supra at 472-473, and cases cited ("The prosecutor's remarks were characteristic of 'enthusiastic rhetoric, strong advocacy, and excusable hyperbole,' and did not cross the line between fair and improper argument").

Moreover, even if certain of the remarks might have been better avoided, there was no error giving rise to a substantial likelihood of a miscarriage of justice. Given the properly admitted evidence, the comments that the defendant wanted someone else to "do the dirty work" so that he could have an alibi, or

that he "wishe[d] to envelop" himself "in a cloak of darkness, in a shroud of secrecy," did not step over the line of zealous advocacy.  Furthermore, during his final charge immediately after the prosecutor's closing, the judge instructed that closing arguments are not evidence, but "merely an opportunity for [the attorneys] to sum up from their perspective what they felt the evidence might suggest or mean to you."  See Commonwealth v. Francis, supra at 140-141; Commonwealth v. Kozec, supra at 517 ("instructions may mitigate any prejudice in the final argument").

6.  Review pursuant to G. L. c. 278, § 33E.  Having reviewed the entire record pursuant to G. L. c. 278, § 33E, we discern no reason to reduce the conviction of murder in the first degree to a lesser degree of guilt or to order a new trial.

Judgment affirmed.