NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-13575

COMMONWEALTH  vs.  MICHAEL MOSCARITOLO.

Plymouth.      November 10, 2025. – March 6, 2026.

Present:  Budd, C.J., Gaziano, Wendlandt, Georges,
& Wolohojian, JJ.

Homicide.  Felony-Murder Rule.  Burglary.  Joint Enterprise.
     Practice, Criminal, Instructions to jury, Hearsay,
     Duplicative convictions, Capital case.  Malice.  Evidence,
     Hearsay, Joint venturer.

Indictments found and returned in the Superior Court
Department on November 25, 2015.

The cases were tried before Cornelius J. Moriarty, II, J.

Patricia A. DeJuneas for the defendant.
Melissa W. Johnsen, Assistant District Attorney, for the
Commonwealth.

WENDLANDT, J.  Executing a plot hatched months prior to the

brutal killing of Robert McKenna (victim), the defendant,

Michael Moscaritolo, and his coventurers, James W. Ferguson and

Mark O'Brien,[1] entered the victim's Marshfield home to steal the victim's extensive firearm collection and marijuana plants. The victim, however, was not an "easy mark." In the prolonged struggle that ensued, the victim was struck repeatedly in the head and body with a metal frying pan with sufficient ferocity to dent the pan. The blunt force trauma to the victim's head, together with a deep incision in his arm, caused the victim to die of exsanguination. Following a second jury trial, the defendant was convicted of murder in the first degree on the theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder.[2]

On appeal, the defendant challenges the sufficiency of the evidence of deliberate premeditation, contends that the trial judge erroneously denied his request for an involuntary manslaughter instruction and improperly allowed the admission of multilevel hearsay testimony, and claims that his conviction of burglary with assault on an occupant, see note 2, supra, must be

---

[1] The three coventurers were tried separately. We affirmed O'Brien's conviction of murder in the first degree. See Commonwealth v. O'Brien, 494 Mass. 288 (2024). Ferguson was also convicted of murder in the first degree on a theory of felony-murder; in Commonwealth v. Ferguson, 497 Mass.   (2026), also issued today, we affirm that conviction.

[2] The defendant was also convicted of burglary with assault on an occupant, in violation of G. L. c. 266, § 14; unarmed robbery, in violation of G. L. c. 265, § 19 (b); and five counts of larceny of a firearm, in violation of G. L. c. 266, § 30 (1), at a prior trial. See note 18, infra.

vacated as duplicative of his felony-murder conviction. Finally, the defendant asks that we exercise our extraordinary authority under G. L. c. 278, § 33E, to reduce his conviction to murder in the second degree or manslaughter.

After carefully reviewing the defendant's claims on appeal and having conducted an independent review of the entire record, we discern no error and no reason to exercise our extraordinary authority under G. L. c. 278, § 33E, to order a new trial or to reduce the verdict of murder in the first degree to a lesser degree of guilt. Accordingly, we affirm.

1. Background. The following facts are supported by the evidence presented at the defendant's second trial.

The victim was a wealthy, retired stockbroker who lived in Marshfield. He operated a sophisticated marijuana "grow" operation in the basement of his home and owned a collection of firearms, which he housed in the attic crawl space above the garage and guest bedroom closet. He showcased the grow operation and the firearm collection to visitors, including Thomas Gunning,[3] who photographed these items.

Gunning also was acquainted with the defendant, from whom Gunning purchased marijuana. Approximately six months before

---

[3] Gunning testified pursuant to a cooperation agreement.

the killing, Gunning shared a photograph of the grow operation with the defendant.

a. The defendant's scheme. The defendant became fixated on the victim's grow operation. The defendant constantly questioned Gunning about the victim, his house, and the grow operation; he asked where the victim lived, when the marijuana plants would be harvested, when the victim left his home, and how many entrances the home had. Eventually, at the defendant's insistence, Gunning drew a diagram of the home's floor plan, including the location of the garage, from which the grow operation could be accessed, and the location of each entryway into the home.

The defendant shared a photograph of the victim's grow operation with his childhood friend, Michael Cevoli, explaining that the victim lived in "Humarock."[4] The defendant remarked to Cevoli, "If you grow pot, then it's fair game. Anyone can take it," and described himself as a "pirate."

Several months before the victim's death, the defendant also learned of the victim's firearm collection. In particular, approximately two months before the victim's death, the defendant asked Gunning whether the victim had a "crossbow,"

---

[4] The jury heard testimony that the victim's home was located in an area that "an outsider . . . could consider . . . part of Humarock."

stating that he wanted the information "in case [he got] shot if [he went] in there to get the pot." Gunning responded that the victim had "tons of weapons." The defendant asked Gunning to forward to him the photographs of the victim's firearms; Gunning had previously sent the photographs to Brianne St. Peter, who was also the defendant's friend. When Gunning did not send the photographs, the defendant accessed Gunning's cellular telephone, which had been left unattended during one of their meetings, and forwarded the photographs to himself by text message.[5]

Four days before the victim's death, the defendant recruited Ferguson, his close friend and client,[6] to join his "master plan" to rob the victim's home. He assured Ferguson that no one would get hurt.[7]

b. The robbery and killing. On the evening of September 15, 2015, Ferguson and O'Brien traveled from Boston in O'Brien's

---

[5] Gunning also told the defendant about the African artifacts and taxidermy displayed in the victim's house. The defendant asked Ferguson's roommate, an auctioneer, whether he had experience auctioning African art and masks. The auctioneer replied that he did not.

[6] The defendant was an attorney.

[7] Like the defendant, Ferguson had grown up in Marshfield; he lived in the Dorchester section of Boston with the auctioneer, with whom the defendant had discussed African art, see note 5, supra, and the auctioneer's fiancée.

sport utility vehicle (SUV), arriving in the southern end of Marshfield a little after 11 P.M.[8] Meanwhile, by approximately 9:30 P.M., the defendant, who lived in Quincy with his girlfriend, Lauren Kalil, was at his mother's home in Marshfield, where he remained until approximately 11:57 P.M.[9]

Between 12:02 A.M. and 12:47 A.M., on September 16, 2015, the defendant, and inferably Ferguson and O'Brien, traveled in the direction of the victim's home. Between 12:48 A.M.[10] and 4:12 A.M.,[11] the defendant's cellular telephone was turned off.

---

[8] Ferguson called the defendant several times while en route to Marshfield. His last call to the defendant was at 11:02 P.M. Soon thereafter, Ferguson turned off his cellular telephone. O'Brien had turned his cellular telephone off earlier, while he and Ferguson were headed south to Marshfield.

[9] After failing to reach the defendant for several hours earlier that day, Kalil went to the defendant's mother's home. She knocked on the door and saw that the lights were on inside, but the defendant did not answer. Kalil called the defendant "about [ninety] times" that evening to no avail.

Kalil testified pursuant to a cooperation agreement.

[10] Consistent with the defendant's arrival at the victim's home, at around 1 A.M., the victim's next door neighbor (first neighbor) awoke to the sound of glass breaking; the sound came from the direction of the victim's house. A second neighbor, who lived in the house directly across the street from the victim, was also awakened at around the same time.

[11] Both neighbors were awakened again at around 3 A.M. The first neighbor heard a loud crash followed by several popping noises, the victim's dogs barking, and "three or four" men arguing. Looking out her window, she saw in the victim's driveway a dark-colored car that did not belong to the victim.

The jury were warranted in concluding that between these early morning hours, the three coventurers entered the victim's home and killed him.

c. Crime scene investigation. Approximately twelve hours later, the victim's body was found, lying face-up on his kitchen floor; the victim was barefoot, wore only boxer shorts, and was covered in blood. The victim had a deep, gaping wound on his right arm just below his armpit, as well as lacerations to his head and cuts and bruises all over his body.

Responding officers noticed "dried blood almost everywhere" in the home's interior. There was blood around the victim's body, as well as on the kitchen counter and cabinets. On the wall just outside the kitchen, there was an alarm keypad covered in blood with the victim's bloody palm print.

The trail of blood continued into the open concept living and dining room, where investigators observed blood on the couch and a bloodstained newspaper. A torn, purple latex glove was discovered on the dining room floor in an area with bloody shoe

---

She saw a man walk out of the victim's home, get into the car, and drive away.

At around the same time, the second neighbor, also awakened by dogs barking from the direction of the victim's house, looked out his window; he heard a male voice and saw a man walking from the victim's driveway toward the second neighbor's house. The man was holding a bag. The second neighbor also heard a car running at the nearby corner. Soon afterwards, the second neighbor noticed a black car in the victim's driveway.

prints.  Forensic analysis later detected the defendant's deoxyribonucleic acid (DNA) on the glove's interior.

Blood also stained the walls and floor of the hallway leading to the primary and guest bedrooms.  The wall outside the guest bedroom was dented.  A rug in the hallway was twisted and pushed against the wall, suggesting a struggle.  It appeared that the struggle continued inside the guest bedroom, where the bed was detached from the headboard and askew from the wall.  The large glass window bore a gaping hole in the center, and there were "dynamic" bloodstains[12] below the window and larger pools of blood on the floor, along with broken glass scattered on the bedroom floor and outside on the patio.

In the primary bedroom, a metal frying pan splattered with the victim's blood lay on the floor beside the doorway; one side of the pan was dented.  The bedroom floor was stained with blood.

In the garage, a ladder was propped up, positioned to allow access to the attic crawl space area where the victim's firearms had been stored; the firearms were missing.  In the basement, the victim's marijuana plants had been harvested; investigators recovered two bags of marijuana in the closet of the guest

---

[12] The Commonwealth's bloodstain pattern expert testified that "dynamic" stains indicate that an outside force was applied to the blood to create the resulting stain.

bedroom and more in the oven.  Behind the garage lay a fanny pack and a flashlight.  The defendant and the victim were potential DNA contributors to the flashlight.  A black and gold "Mechanix" brand glove was recovered a few houses away from the victim's home; it contained the DNA of the defendant, Ferguson, and the victim.

Police officers also recovered a left Nike Air Max sneaker that was stained with the victim's blood on the side of Route 3A in Marshfield, approximately two miles from the victim's home. A more expansive search of the area yielded the matching right Nike Air Max sneaker.  The right sneaker was also stained with the victim's blood and contained the defendant's wearer DNA as the major contributor profile.

There were three distinct sets of shoe prints in the trails of blood throughout the home and garage, as well as one set of barefoot impressions that led through the hallway toward the kitchen.  The three distinct shoe prints appeared as (1) a "lug-style" sneaker sole with a Nike brand "swoosh" in the toe area, the word "Nike" in the heel area, and a block pattern along the sides; (2) a sneaker sole with a concentric circular pattern in the ball and heel areas; and (3) a sneaker sole with a zigzag or lightning bolt pattern.  Footprints of the first two shoe patterns were found throughout the house, particularly in the primary bedroom, kitchen, living and dining area, and garage; a

few impressions of the third pattern were also visible in the hallway adjacent to the kitchen, living area, and garage. One investigating officer diagrammed and analyzed the three distinct sets of shoe prints from the crime scene and concluded that the Nike Air Max sneakers recovered along Route 3A, one of which contained the defendant's wearer DNA, matched the size, design, and distinctive wearer characteristics of the lug-type sneaker design with the Nike swoosh in the toe area and Nike name on the heel the impressions of which were observed throughout the victim's house, including in the primary bedroom, kitchen, living and dining area, and garage.

Near the sneakers, officers also recovered a camouflage jacket and shorts, each stained with the victim's blood; the jacket and shorts were similar to ones worn by the defendant in two photographs taken that summer. In addition, officers found a blue long-sleeved T-shirt that was stained with the victim's blood. The shirt had orange writing and was given to attendees of a memorial golf tournament; records showed that the defendant had purchased a ticket to the golf tournament in 2010. Ferguson's wearer DNA was detected on the shirt.

d. <u>Cause of death</u>. The victim's autopsy report showed that he sustained numerous blunt force injuries to the head, torso, and upper and lower extremities. Notably, the victim suffered three lacerations from blunt force trauma to the back

of his head, ranging in length from one and one-half to two and one-quarter inches, and a fourth laceration to the left forehead, measuring one and one-half inches. These wounds would have caused profuse bleeding. The victim also suffered numerous other bruises and abrasions to his forehead, eye, cheek, ear, mouth, and jaw. These injuries were caused by a blunt object consistent with the dented metal frying pan that was found in the primary bedroom and stained with the victim's blood. The victim additionally sustained numerous blunt force injuries to the rest of his body, including his chest, abdomen, and back, as well as multiple bruises and abrasions on his arms and legs.

Further, the victim had a gaping four and one-quarter inch long and two-inch deep sharp force injury under his right armpit area. This injury sliced through a major vein and artery and would have caused a significant amount of blood loss. Without medical intervention, it would have caused the victim to bleed out within minutes. The jury were warranted in concluding that this injury was caused when, following a struggle in the hallway and inside the guest bedroom, the victim careened into the bedroom window with sufficient force that his arm broke through the glass. The medical examiner concluded that the victim died

due to exsanguination from the deep incision to his upper arm and the multiple lacerations to his scalp.[13]

e.  The aftermath.  At around the time that the victim's body was discovered, the defendant sent photographs of the victim's firearm collection by text message to his friend, St. Peter.  St. Peter, to whom Gunning had previously sent photographs of the victim's weapons, see discussion supra, responded, "OMFG  . . . BADASS . . . ," and asked the defendant what he wanted for them.  Later that afternoon, the defendant, Ferguson, and O'Brien met at the defendant's Quincy home. O'Brien had a large, fresh cut under his eye, and in O'Brien's SUV lay a large, blue bag, inferably containing the firearms stolen from the victim's home.

A few days later, Ferguson's cousin drove to the defendant's Quincy home with St. Peter in a pickup truck borrowed from St. Peter's husband, Shane McMahon.  Arriving at around midnight, Ferguson's cousin and St. Peter were greeted by the defendant, who placed a large, heavy duffel bag in the bed of McMahon's truck.  The bag's landing in the truck bed sounded like metal-on-metal; the defendant told Ferguson's cousin that

---

[13] A toxicology report showed the presence of drugs including opioids, benzodiazepines, and marijuana in the victim's blood; the medical examiner testified that the substances did not cause the victim's death.

the bag contained weights for St. Peter's son.  Later, McMahon[14] found the bag in his truck; the bag had five long rifles inside.[15]

f.  The defendant's admissions and arrest.  Meanwhile, the defendant had a conversation about the now-publicized murder with his friend, Cevoli, during which Cevoli remarked that anyone who did something like that would get caught.  The defendant disagreed, saying, "[T]hey must have been stealth."  Responding to Cevoli's continued skepticism, the defendant stated, "They must have been pretty smart . . . they're one step ahead . . . I don't know . . . I don't think they'll get caught."

Approximately one week after the victim's body was discovered, Gunning learned of the victim's death.  He immediately called the defendant and asked whether the defendant had killed the victim.  The defendant did not answer Gunning's accusation, responding only that it had been "the busiest week" for crime in Marshfield.

When Kalil, the defendant's girlfriend, learned of Ferguson's arrest and saw news reports about a discarded Nike

---

[14] McMahon testified pursuant to a cooperation agreement.

[15] McMahon later discovered two plastic bags filled with ammunition inside his work boots, which were also in the utility box in the back of his truck.

Air Max sneaker, the defendant remarked to her that he "hoped he didn't get caught up in it because he gave [Ferguson] his sneakers" and "they were idiots that they threw stuff out on 3A." The defendant asked Kalil to throw away bags containing a towel and cut-up clothing and to get rid of a stun gun; she complied with the first request but not the second.[16] At around the same time, the defendant told Kalil that "he [felt] no pain" because he almost "beat someone to death."

Shortly thereafter, investigators executed a search warrant at the defendant and Kalil's home, finding two purple latex gloves similar to the one found at the crime scene.[17] Following the search, the defendant berated Kalil for giving officers his electronic tablet, stating that he now had to remotely "swipe everything off it."

Kalil pressed the defendant about his involvement in the victim's killing; after initially evading her questions, the defendant eventually admitted that "they were going to get marijuana, and shit hit the fan, and it wasn't supposed to happen like that." The defendant also told Kalil that firearms

---

[16] Kalil was charged as an accessory after the fact to murder; after about four years, she pleaded guilty and entered into a cooperation agreement. See note 9, supra.

[17] Investigators then searched O'Brien's SUV and discovered cleaning supplies and yellow and black Mechanix brand gloves in the back. The driver's seat and seatbelt as well as the rear driver's side seat screened positive for nonvisible blood.

in the back of O'Brien's SUV were intended for St. Peter, and that he had instructed St. Peter not to register them because they would be traced to the victim. Police officers later recovered four rifles and one double-barreled shotgun from a crawl space in St. Peter's mother's garage. One of the rifles had the victim's blood on it, and the victim's brother identified the firearms as belonging to the victim.

g. Defense. The defense, through cross-examination and closing argument, focused on whether the prosecution had met its burden of proof, highlighting gaps in the police investigation and questioning the credibility of prosecution witnesses, many of whom testified pursuant to cooperation agreements with the government.

2. Prior proceedings. After a second jury trial,[18] the defendant was found guilty of murder in the first degree on the theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder. He was sentenced to life imprisonment without the possibility of parole on the murder conviction and to terms of from thirty to forty years on the

---

[18] Following a first jury trial, the defendant was found guilty on charges of burglary with assault on an occupant and unarmed robbery, as well as five counts of larceny of a firearm. The jury were unable to reach a unanimous verdict on the charge of murder in the first degree, and the judge declared a mistrial with respect to that charge. Sentencing was stayed pending the second trial, over which the same judge presided.

burglary with assault on an occupant and unarmed robbery convictions, to be served concurrently with the life sentence. The judge also sentenced the defendant to terms of from four to five years on the five larceny of a firearm counts, to be served concurrently with the life sentence. The defendant timely appealed.

3. Discussion. The defendant contends that the Commonwealth failed to present sufficient evidence of deliberate premeditation to support a conviction of murder in the first degree under that theory, the trial judge erred in denying his requests for instructions on involuntary manslaughter, the judge improperly admitted multilevel hearsay under the joint venture exclusion to the hearsay rule, and his conviction of burglary with assault on an occupant is duplicative of his conviction of murder in the first degree under the felony-murder theory. We address each argument in turn.

a. Sufficiency of evidence. The defendant first challenges the sufficiency of the evidence to support the conviction of murder in the first degree under a theory of deliberate premeditation. He rightly does not challenge the sufficiency of the evidence supporting the conviction under the theory of extreme atrocity or cruelty, or felony-murder. As such, we need not address the defendant's challenge to one theory of murder in the first degree. See Commonwealth v. Cheng

Sun, 490 Mass. 196, 201 (2022) ("this court has, at times, declined to evaluate the sufficiency of the evidence as to one theory of murder where the jury convicted a defendant on two theories").  See, e.g., Commonwealth v. Barbosa, 463 Mass. 116, 135 (2012) (declining to address claim of insufficiency of evidence on theory of extreme atrocity or cruelty where jury also convicted defendant on theory of deliberate premeditation).

b.  Involuntary manslaughter instruction.  The defendant next asserts that the judge erred in declining to instruct the jury on involuntary manslaughter.

i.  Standard of review.  Because the defendant requested an involuntary manslaughter instruction, we review the trial judge's decision not to provide the instruction for prejudicial error.  See Commonwealth v. Escobar, 493 Mass. 694, 708 (2024). "It is well established that if, in a murder prosecution, the jury would be warranted in finding the defendant guilty of manslaughter, rather than murder, it is reversible error not to give an instruction on manslaughter." Commonwealth v. Chase, 433 Mass. 293, 298 (2001), quoting Commonwealth v. Martinez, 393 Mass. 612, 613 (1985).

"An involuntary manslaughter instruction is required where 'any view of the evidence will permit a finding of manslaughter and not murder.'"  Commonwealth v. Tyler, 493 Mass. 752, 760 (2024), quoting Commonwealth v. Jessup, 471 Mass. 121, 135

(2015).  In determining whether an involuntary manslaughter instruction is warranted, "the evidence must be viewed in the light most favorable to the defendant" (citation omitted). Escobar, 493 Mass. at 708.

Relevant to the defendant's claim on appeal, "[i]nvoluntary manslaughter arises 'where wanton [or] reckless conduct causes death.'"  Commonwealth v. O'Brien, 494 Mass. 288, 297 (2024), quoting Commonwealth v. Simpson, 434 Mass. 570, 590 (2001). "Such wanton or reckless conduct is 'intentional conduct that create[s] a high degree of likelihood that substantial harm will result to another person.'"  O'Brien, supra, quoting Commonwealth v. Pagan, 471 Mass. 537, 547, cert. denied, 577 U.S. 1013 (2015).  See, e.g., Commonwealth v. Welansky, 316 Mass. 383, 387, 397 (1944) (nightclub owner guilty of manslaughter in deadly fire resulting from wanton or reckless management of club, despite being absent at time of fire). "[I]n all cases . . . [the court] must look at the conduct that caused the result to determine whether it was wanton or reckless, not the resultant harm."  Commonwealth v. Hardy, 482 Mass. 416, 424 (2019).

"Murder, by contrast, requires a showing of malice." O'Brien, 494 Mass. at 298, citing Pagan, 471 Mass. at 546.  To convict a defendant of murder in the first degree on the theory of deliberate premeditation, malice "requires the Commonwealth

to prove that the defendant consciously and purposefully intended to cause the victim's death" (quotation and citation omitted).  Commonwealth v. Santana-Rodriguez, 496 Mass. 693, 697 (2025).  For murder in the first degree on the other theories, malice may be proven by showing that the defendant (1) intended to kill the victim; (2) intended to cause grievous bodily harm to the victim; or (3) intended to do an act that, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood of death.  Id. at 697 n.3.  See Commonwealth v. Castillo, 485 Mass. 852, 858 (2020), citing Commonwealth v. Szlachta, 463 Mass. 37, 45-46 (2012).  "The difference between the elements of the third prong of malice" -- commission of an act that, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood of death -- "and . . . involuntary manslaughter lies in the degree of risk of physical harm that a reasonable person would recognize was created by particular conduct, based on what the defendant knew."[19]

---

[19] For trials commencing after this court's decision in Commonwealth v. Brown, 477 Mass. 805 (2017), cert. denied, 586 U.S. 826 (2018), "the Commonwealth must prove malice to obtain a murder conviction" on the theory of felony-murder.  O'Brien, 494 Mass. at 297 n.10, citing Brown, supra at 807.  The defendant's first trial began on April 1, 2019.

O'Brien, supra, quoting Commonwealth v. Sires, 413 Mass. 292, 303 n.14 (1992).

ii. Risk of death. "Where, as here, the severity of a beating is such that 'it is obvious that the risk of physical harm to the victim creates a plain and strong likelihood that death would follow . . . an instruction on involuntary manslaughter [is] not warranted.'" O'Brien, 494 Mass. at 298, quoting Commonwealth v. Burnham, 451 Mass. 517, 527 (2008). See, e.g., Commonwealth v. Moseley, 483 Mass. 295, 303-304 (2019) ("obvious risk of physical harm associated with" strangling victim rendered involuntary manslaughter unavailable). "In other words, [an involuntary manslaughter instruction is not warranted where] the 'circumstances of the killing and injuries sustained by the victim' may be '[in]consistent with anything other than [a finding of] malice.'" O'Brien, supra at 298-299, quoting Commonwealth v. Silva, 471 Mass. 610, 621-622 (2015) (involuntary manslaughter instruction not warranted where defendant and coventurer severely beat victim, knocked him down, kicked him, and stomped on his chest causing victim's eyes to "bug out").

In the case of one of the defendant's coventurers, we summarized the evidence as follows:[20]

> "[T]he victim suffered multiple blows to the front of his head, his torso, and his extremities. The beating also included repeated strikes to the back of his head with a frying pan with such ferocity that the pan deformed, and the chaotic carnage of the blood-drenched crime scene indicated a prolonged and violent struggle. These circumstances of the victim's death, and the injuries he sustained, are inconsistent with a finding of . . . mere wanton or reckless conduct likely to cause substantial harm short of death."[21]

O'Brien, 494 Mass. at 299. See, e.g., Commonwealth v. Nichypor, 419 Mass. 209, 217 (1994) ("The risk of harm associated with stabbing a person in the head with knives and slashing a person's throat with a razor blade is the kind of risk that could only lead to a determination of malice").

---

[20] In O'Brien, 494 Mass. at 296-297, one of the defendant's coventurers raised an ineffective assistance of counsel claim predicated on his counsel's decision to withdraw a request for an involuntary manslaughter instruction. In assessing the coventurer's claim, we determined that an involuntary manslaughter jury instruction was not warranted by the record evidence. Id. at 298-299.

[21] The defendant suggests that evidence of malice was lacking because, although "firearms and knives were readily available" to the coventurers, they chose a frying pan, "an opportunistic weapon which is not dangerous per se." "[I]tems that are not dangerous weapons per se may, however, qualify as dangerous weapons as used." Commonwealth v. Keown, 478 Mass. 232, 249-250 (2017), cert. denied, 583 U.S. 1139 (2018). See, e.g., Commonwealth v. Gebo, 489 Mass. 757, 773-774 (2022) (plastic chair). Here, the jury were warranted in concluding that the use of the frying pan to assault the victim rendered it a dangerous weapon.

To be sure, the jury could have inferred that the defendant, although present during the extensive, prolonged beating of the victim, did not himself strike the victim.  Such an inference, however, does not support an involuntary manslaughter instruction in view of the overwhelming evidence, detailed supra, of the defendant's participation in the murder as a joint venturer.[22]  See O'Brien, 494 Mass. at 299-300 (evidence "fails to support a theory that . . . the defendant . . . merely was present inside the victim's home but was unaware of, and not complicit with, the repeated and brutal assaults on the victim as he moved from room to room around the house, spurting blood from his extensive wounds").  See also Commonwealth v. Semedo, 422 Mass. 716, 718-719 (1996) (defendant guilty of murder in first degree where he participated in fatal group attack on victim in which defendant held, kicked, and punched victim while another stabbed him, even if defendant did not inflict fatal blow or hold murder weapon).

The defendant contends that, unlike his coventurer, he was entitled to an involuntary manslaughter instruction because, as

---

[22] Murder in the first degree by joint venture requires proof that "the defendant was present at the scene of the crime, with knowledge that another intended to commit a crime, and by agreement was willing and available to help the other if necessary," and "that the defendant shared with the principal the mental state required for the crime of murder." Commonwealth v. Semedo, 422 Mass. 716, 719 (1996).

the mastermind of the robbery scheme, the jury could find that he was singularly focused on obtaining the marijuana from the victim's grow operation as well as the firearm collection, both of which were away from the main house and accessed by the garage.  Thus, he maintains, the jury would be warranted in finding that he was not in the main house during the violent, extensive attack on the victim by the coventurers, but that he merely was wanton or reckless in developing the planned robbery pursuant to which the coventurers were to distract the victim, who they knew had access to firearms.

As the trial judge explained when declining to give the sought instruction, this theory rests on speculation, requiring the jury to ignore the physical and forensic evidence showing the defendant's presence in the main house alongside his coventurers as they pummeled the victim.[23]  The evidence included, inter alia, a torn, purple latex glove containing the defendant's DNA, which was found in the victim's dining room. Sneakers found in the flight path from the victim's home were

---

[23] The defendant's reliance on Commonwealth v. Malone, 100 Mass. App. Ct. 399 (2021), and Welansky, 316 Mass. at 399, is misplaced.  The defendant's actions were not limited to "planning and implementing the robbery of a drug dealer," Malone, supra at 407 n.13, or "indifference to or disregard of probable consequences," Welansky, supra; rather, the evidence shows the defendant's extensive role in the joint venture from, inter alia, planning the robbery, recruiting Ferguson, executing the plan, assisting in the cover-up, and disposing of the stolen goods.

splattered with the victim's blood, and one contained the defendant's wearer DNA; these same shoes were tied to one of the three sets of shoeprints found alongside the impressions of the victim's bare feet throughout the victim's home, including the dining and living area, the hallway leading to the bedrooms, the kitchen where the victim's body was found in a pool of blood, and the master bedroom where the frying pan was recovered. The shoeprints were not confined to the garage, basement, or attic.[24]

---

[24] Because the sequencing of the shoeprints is unknown, the defendant argues that the jury could have inferred that the Nike Air Max shoeprints were placed after the violence occurred. Similarly, at trial, defense counsel posited that the defendant may have come to the crime scene after the killing in response to a call for assistance from Ferguson; the defendant presses this argument on appeal. But these accounts fail to address that the defendant's shoeprints were found together with the shoeprints of two others (presumably the coventurers) and near the victim's barefoot impressions. The sets of shoeprints permeated the house, as discussed supra, which, together with the other physical and forensic evidence showing a prolonged brutal attack on the victim, fail to support a theory that the defendant entered the house only after the killing, or only to check on the victim's body as it lay on the kitchen floor following the victim's death.

Moreover, the theory finds no support in the extensive evidence of the defendant's role in planning the robbery, including inquiring whether the victim might be armed, in the plan's execution, and in possessing and disposing of the victim's firearm collection thereafter. The defendant's other theories -- including that his DNA was at or near the scene because he lent his clothing to others, including his sneakers, golf tournament shirt, camouflage print outfit, and Mechanix brand gloves -- were implausible given the extensive evidence of, inter alia, his role in planning the robbery and in transferring the victim's firearms to St. Peter. See Commonwealth v. Egerton, 396 Mass. 499, 505 (1986) ("The judge

The defendant's DNA, together with the victim's DNA, was found on the flashlight behind the victim's garage. Further, the glove recovered a few houses away from the victim's home contained the DNA of the defendant, Ferguson, and the victim. The defendant's theory that his coventurers alone interacted with the victim ignores this evidence, as well as the evidence that the attack on the victim was prolonged and brutal.

Moreover, the evidence showed that, after the killing, the defendant continued his participation in the joint venture. The defendant met with Ferguson and O'Brien to obtain the stolen firearms from O'Brien's SUV and sent photographs of the firearms to St. Peter. When St. Peter expressed an interest in the firearms, the defendant met with her and placed a heavy bag in her husband's truck that later was found to contain the victim's firearms. See Commonwealth v. Eagles, 491 Mass. 210, 218-219 (2023) (evidence of defendant's liability on joint venture theory of felony-murder sufficient even if jury credited defendant's testimony that he served only as lookout, where defendant continued to participate in robbery after entering trailer where victim was killed). In short, the defendant's

_____

need not reconstruct all possible factual scenarios subsumed in the evidence presented, no matter how unreasonable, and charge the jury accordingly"); Commonwealth v. Lee, 383 Mass. 507, 514 (1981) ("A judge is not required to charge on situations which are merely speculative and unsupported by the evidence").

theory that he was neither present while his coventurers repeatedly beat the victim over a prolonged period of time, nor complicit therein, rests on speculation unsupported by the evidence.  See Commonwealth v. Garcia, 482 Mass. 408, 411 (2019) ("The defendant's theory of events is entirely speculative," because "[t]he evidence provides no detail about the victim's supposed attack against the defendant," and "a judge should not instruct the jury on a hypothesis not supported by the evidence" [quotations and citations omitted]).

Alternatively, the defendant asserts that -- even if the jury were to find that he was present during the prolonged violent attack on the victim -- an involuntary manslaughter instruction was warranted because the jury could infer that the severe beating of the victim with the frying pan was wanton or reckless conduct that created an "immediate sense of danger," causing the victim to attempt to flee by breaking through the guest bedroom window and severing the artery in his arm, which eventually led to his death.  As discussed supra, the use of the frying pan to strike the victim repeatedly on the front of his head, the back of his head, his torso, and his extremities is inconsistent with a finding other than that the defendant acted with, at the least, third prong malice; a reasonable person would understand that beating the victim with such ferocity as to deform the metal frying pan created a plain and strong

likelihood that death would follow.[25]  In sum, the judge did not err in declining to give an involuntary manslaughter instruction.

c.  Hearsay.  The defendant next maintains that the trial judge erred in allowing Audra Romani,[26] Ferguson's girlfriend, to testify that, in the days before the killing, Ferguson told her that the defendant had developed a plan whereby the defendant, Ferguson, and possibly another person would rob a wealthy man in Marshfield.[27]  The defendant contends that Romani's testimony

---

[25] Contrary to the defendant's argument, the record does not support mere wanton or reckless conduct, by setting in motion a series of responsive acts by the victim or his environment that eventually caused death.  Contrast Commonwealth v. Jenner, 24 Mass. App. Ct. 763, 771-775 (1987) (sufficient evidence for involuntary manslaughter conviction where defendant chased, jumped on, and robbed elderly victim, leaving victim in snow, where he died from exposure or asphyxiation); Commonwealth v. Joyce, 18 Mass. App. Ct. 417, 419-421 (1984) (upholding conviction of involuntary manslaughter where defendants chased victim into subway station while showering subway platform with rocks and bottles, and victim, fearing for his life, jumped onto subway tracks and was hit and killed by subway train).  Nor does it support the defendant's theory that the victim's arm accidentally broke through the double paned glass window due to the victim's disorientation following ingestion of drugs.

[26] Romani testified at the defendant's second trial pursuant to a grant of immunity.

[27] The defendant made these remarks to Ferguson during a telephone call that Ferguson took in Romani's presence, but which Romani did not overhear.  Specifically, Romani testified that Ferguson told her "[t]hat there was a plan . . . to rob a man from Marshfield with a lot of money," that the defendant devised the plan, and that two or three people would be participating in the plan.

constituted inadmissible multilevel hearsay because even if the first level of out-of-court statements -- the defendant's statements to Ferguson -- were admissible, the second level of out-of-court statements -- Ferguson's statements to Romani relaying what the defendant told him -- were inadmissible hearsay not within any exception to the rule prohibiting the admission of hearsay.

i.  Standard of review.  "We review evidentiary decisions of the trial judge for an abuse of discretion."  Commonwealth v. Da Lin Huang, 489 Mass. 162, 172 (2022).  In doing so, we evaluate whether "the judge made a clear error of judgment in weighing the factors relevant to the decision, such that the decision falls outside the range of reasonable alternatives" (quotation and citation omitted).  L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

If we determine that the admission comprised an abuse of discretion, then where, as here, the objection was preserved, we next consider whether the defendant was prejudiced.  See Commonwealth v. Rakes, 478 Mass. 22, 37 (2017) (where error preserved by timely objection, "[w]e review the judge's decision to place a joint venturer's statement before the jury for [prejudicial error resulting from an] abuse of discretion").  We consider "whether there is a reasonable possibility that the error might have contributed to the jury's verdict" (citation

omitted). Commonwealth v. Carriere, 470 Mass. 1, 7 (2014). Reversal is warranted unless we can conclude with fair assurance, after pondering the totality of what transpired, including the erroneously admitted evidence, that the error "did not influence the jury, or had but very slight effect" (citation omitted). Id. at 8. See Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994).

ii. Multilevel hearsay. In general, where a witness testifies to an out-of-court statement based on a chain of out-of-court statements, the testimony is admissible only if each out-of-court assertion in the chain is admissible. See Commonwealth v. Rivera, 482 Mass. 259, 268 (2019). See generally Mass. G. Evid. § 805 (2025).

A. First level: statement of party opponent. As the Commonwealth contends, the first set of out-of-court statements -- namely, the defendant's statements to Ferguson -- were admissible as statements of a party opponent. See Commonwealth v. Hobbs, 482 Mass. 538, 558 (2019); Commonwealth v. Bright, 463 Mass. 421, 426 n.8 (2012). See generally Mass. G. Evid. § 801(d)(2)(A).

B. Second level: statement of joint venturer. The Commonwealth maintains that the second set of out-of-court statements -- namely, Ferguson's statements to Romani -- were

not hearsay because they were statements of a joint venturer made in furtherance of the joint venture.  We disagree.

"Out-of-court statements by joint venturers are admissible against the others if the statements are made during the pendency of the criminal enterprise and in furtherance of it."[28] Commonwealth v. Winquist, 474 Mass. 517, 520-521 (2016), quoting Carriere, 470 Mass. at 8.  To admit a coventurer's out-of-court statement, the trial judge must first make "a preliminary determination, based on a preponderance of admissible evidence other than the out-of-court statements themselves, that a criminal joint venture existed between the declarant and the defendant, and that the statement was made in furtherance of the venture."  Bright, 463 Mass. at 426.  See generally Mass. G. Evid. § 801(d)(2)(E).  This preliminary determination permits the statement to be placed in front of the jury, which must then make an independent determination, again based on a

---

[28] Such joint venturer statements are deemed not to be hearsay; the rationale for the rule "derives from an analogy between a criminal venture and a lawful partnership:  each venturer is treated as an 'agent for the other in all matters relating to the common object, and the acts and declarations of one in furtherance of such object are admissible to affect the principal as well as the agent'" (citation omitted).  Bright, 463 Mass. at 426.  Joint venturer statements are considered sufficiently reliable to be admitted in evidence due to "[t]he community of activities and interests which exists among the coventurers during the enterprise."  Commonwealth v. White, 370 Mass. 703, 712 (1976).

preponderance of the evidence other than the statement itself, that a joint venture existed and that the statement was made in furtherance of that joint venture.  Bright, supra at 427.

The admissibility of Romani's testimony turns on whether the record supports the trial judge's finding by a preponderance of the evidence that Ferguson made the statements in furtherance of the joint venture.[29]  "We have expressed skepticism that disclosure of the circumstances of the crime to a third party can be considered as furthering an effort to conceal the very crime disclosed."  Bright, 463 Mass. at 436 n.21.  See id. at 433 n.16, quoting Commonwealth v. Bongarzone, 390 Mass. 326, 340 n.11 (1983) ("'[c]onfessions or admissions of conspirators or joint venturers' to strangers or third parties unsympathetic to the goals of the venture 'are not admissible . . . as vicarious statements of the other members of the conspiracy or joint venture'").

For example, in Commonwealth v. Stewart, 454 Mass. 527, 529, 537 (2009), we concluded that a coventurer's statement to an ostensibly sympathetic third party -- an individual with whom

_____

[29] The trial judge did not abuse his discretion in finding by a preponderance of the evidence that a joint venture between Ferguson and the defendant existed.  See Bright, 463 Mass. at 435 ("view[ing] the evidence presented to support the existence of a joint venture 'in the light most favorable to the Commonwealth,'" and concluding there was "ample evidence" to support joint venture's existence [citation omitted]).

the coventurer had committed other crimes -- that he had murdered the victim was inadmissible because the statement did not "conceal the crime," but rather achieved "the opposite": "[i]t revealed the crime to someone who was not a member of the joint venture." Here, as in Stewart, a coventurer revealed incriminating information to an ostensibly sympathetic third party, his girlfriend, and the statements did not conceal the crime; instead, the statements revealed incriminating information to a person outside the joint venture.

The Commonwealth asserts that the statements fall under the joint venture exemption because Ferguson's statements were made to enlist Romani, a trusted audience, in the future concealment of the crime once it was eventually executed. But, unlike the cases relied on by the Commonwealth, nothing in the record supports the conclusion that Ferguson revealed details of the planned crime to encourage Romani's silence.[30] Contrast

---

[30] The Commonwealth's reliance on Commonwealth v. Wilkerson, 486 Mass. 159 (2020), is misplaced. In Wilkerson, the defendant's girlfriend testified to the statements the coventurer made to the defendant in her presence, the statements she overheard the defendant make during a telephone call with the coventurer, and the defendant's statements to the girlfriend regarding his indecision whether to join the joint venture. Id. at 174. Recognizing that coventurer's statements ordinarily must be made during an existing joint venture, we concluded that admission of her testimony was not an abuse of discretion because the coventurer's statements were "made in furtherance of a joint venture that formed thereafter," id. at 175-176; the coventurer's statements tended to show that he was trying to

Commonwealth v. Chalue, 486 Mass. 847, 851, 873-874, 875 (2021) (coventurer's statements to friends, one of whom helped wash vehicle likely used during murders, permitted coventurer to use her cellular telephone after murders, agreed to delete call log and conceal coventurer's use, and provided misinformation to police at coventurer's request, properly admitted because coventurer "was trying to enlist [friends'] loyalty by giving them enough information that they would feel complicit in the crimes and, therefore, not speak up"); Commonwealth v. Wood, 469 Mass. 266, 271-272, 280-281 (2014) (joint venture exemption applied to coventurer's statements disclosing graphic details of murder to girlfriend immediately following crime where girlfriend witnessed one victim's kidnapping, coventurers returned to girlfriend's apartment to dispose of their bloody clothing following murder, and coventurer made statements while girlfriend was vulnerable to frighten her into silence); id. at 273 n.13, 280-281 (joint venture exemption also applied to coventurer's later disclosures to girlfriend, "one of only two

---

recruit the defendant, id. at 175. Contrary to the Commonwealth's argument, we did not conclude that the girlfriend's testimony was proper because she was a "trusted audience" for the coventurer and the defendant; her testimony was permissible because she witnessed the conversation firsthand. In short, her testimony did not involve multilevel hearsay. Id. at 174 ("According to [girlfriend], [coventurer] came to the house she shared with the defendant and told the defendant" information intended to recruit defendant in crime).

people who could implicate [coventurer] in the murder," where coventurer threatened to harm girlfriend's children, coventurer told girlfriend to lie to police, and girlfriend did so).[31]

Moreover, neither the statements themselves -- that the defendant had developed a plan to rob the victim -- nor the circumstances in which they were made -- at an informal gathering with other friends -- suggest that Ferguson was enlisting Romani in the joint venture.  Contrast Commonwealth v. Steadman, 489 Mass. 372, 376, 380 (2022) (no abuse of discretion to allow coventurer's former mother-in-law to testify to coventurer's statement, "I think [defendant's] in trouble," made after coventurer asked to use her laundry "with bloody shirt in hand and with the defendant washing himself of blood outside [her home, because jury could find statement] was an attempt to enlist [mother-in-law's] aid in concealing the crime"); Chalue, 486 Mass. at 875 (coventurer "was washing [with friend's assistance] one of the cars likely used in the crimes --

---

[31] That Romani initially denied any knowledge of the crime does not support the theory that, at the time Ferguson made the statements to her, he was enlisting her assistance in a cover-up.  Contrast Chalue, 486 Mass. at 875 ("Commonwealth's theory that [by making challenged statements, coventurer] was trying to implicate [friends] in furtherance of the plot" supported by content and context of coventurer's statements, and "buttress[ed]" by fact that coventurer later instructed one friend to tell police that third person committed murders, and friend did so).

presumably in an attempt to conceal evidence -- moments before making the statements" to that friend and another).

iii. _Prejudice_. The defendant argues that he was prejudiced by the improper admission because the prosecution emphasized Romani's testimony that the defendant devised the "master plan" to rob the victim, undermining his defense that Ferguson executed the botched robbery and that the defendant was called to the scene only after the fact. We disagree.

The evidence that the defendant was the mastermind of the robbery was overwhelming. See Commonwealth v. Braley, 449 Mass. 316, 326 (2007) (error in admitting hearsay statement not prejudicial where statement was cumulative of "overwhelming other evidence" that defendant and coventurer participated in crime). Gunning, for example, testified that the defendant became obsessed with the victim's marijuana grow operation and requested a diagram of the victim's home; Gunning also testified to the defendant's fixation on the victim's firearm collection, including his inquiry into whether the victim had weapons "in case [the defendant] get[s] shot if [he] go[es] in there to get the pot" and the defendant's act of sending Gunning's photographs of the firearms to himself when Gunning failed to do so. Cevoli similarly testified that the defendant showed him a photograph of the marijuana grow operation in "Humarock," and remarked, "If you grow pot, then it's fair game. Anyone can

take it."  Kalil further testified that the defendant told her after the murder that the plan was to "get marijuana" but that things went awry and "it wasn't supposed to happen like that." And, as discussed supra, the jury were presented with substantial physical and forensic evidence linking the defendant to the crime.

Moreover, the defendant was able to elicit helpful testimony from Romani, revealing that the defendant's scheme, if executed as planned, was to involve no injuries to the victim.[32] We therefore conclude "with fair assurance" that the jury in this case were "not substantially swayed by the error" (citation omitted).  Hobbs, 482 Mass. at 559-560 (concluding that testimony at issue constituted multilevel hearsay, but finding no prejudice because improper testimony was cumulative of other evidence).

d.  Duplicative convictions.  The defendant next contends that his conviction of burglary with assault on an occupant is

---

[32] On cross-examination and redirect, Romani confirmed her grand jury testimony that Ferguson told her "that the plan was that somebody would go in and distract [the victim] while somebody else took his stuff, and nobody would get hurt," and that the defendant devised the "master plan . . . to make fast money" with "no one getting hurt."  In fact, in closing, defense counsel emphasized Romani's testimony that "[n]obody was supposed to get hurt" to suggest that the defendant lacked intent to kill.

duplicative of his conviction of murder in the first degree under the felony-murder theory.  The defendant's claim fails, however; "where . . . a defendant is convicted of murder in the first degree on a theory of felony-murder . . . and [also] is convicted of murder in the first degree on another theory . . . , the conviction of the predicate felony is not duplicative, and the felony conviction stands."  Commonwealth v. Foster, 471 Mass. 236, 244 (2015).

e.  General Laws c. 278, § 33E, review.  Having reviewed the entire record, we discern no basis to grant relief under G. L. c. 278, § 33E.

4.  Conclusion.  For the reasons discussed, the judgment convicting the defendant of murder in the first degree and the remaining judgments are affirmed.

So ordered.